PATRICK GENT, Plaintiff-Appellee, *v.* COLLINSVILLE VOLKSWAGEN, INC., Defendant-Appellant.

Fifth District    No. 82—129

Opinion filed July 21, 1983.

Dane W. Garrett, of Collinsville, for appellant.

Thomas O. Falb, of Edwardsville, for appellee.

JUSTICE JONES delivered the opinion of the court:

This appeal challenges awards for both compensatory and punitive damages as well as an award of attorney fees made pursuant to section 10a(c) of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 270a(c)). Appellant contends it was reversible error for the trial court to have heard evidence pertaining to the amount of attorney fees at a post-trial hearing after the discharge of the jury because the jury should have heard such evidence during the trial.

The jury found in favor of the plaintiff, Patrick Gent, and against the defendant, Collinsville Volkswagen, Inc., awarding compensatory damages in the amount of $6,000 and punitive damages in the amount of $12,000. The case went to the jury on two counts of the plaintiff's second amended complaint, alleging in one count damages resulting from defendant's violation of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 261 *et seq.*) and in the other count damages resulting from defendant's wilful and wanton misrepresentations. Post trial the trial court denied defendant's motion for a new trial or, in the alternative, remittitur and, after hearing evidence on plaintiff's motion for attorney fees, ordered the defendant to pay attorney fees in the amount of $3,075. On

appeal the defendant raises three issues: (1) whether the award of $6,000 in compensatory damages was against the manifest weight of the evidence; (2) whether the award of $12,000 in punitive damages was against the manifest weight of the evidence; and (3) whether the trial court erred in awarding attorney fees "in a post-trial hearing when no evidence in regard to attorney's fees incurred by appellee was introduced during the jury trial."

In lieu of a transcript of proceedings, a stipulated bystander's report of proceedings has been submitted as part of the record for review. According to the bystander's report, the plaintiff testified at the two-day trial held on October 26 and 27, 1981, that in May of 1978, when he was 19 years of age, he purchased a white 1968 Mercedes Benz automobile from the defendant. While he was looking at the vehicle, he said, a salesman named Dennis approached him and told him that the car might have a problem with the transmission and might have a "few" rust spots. Plaintiff testified, "To me, the car looked as though it was in excellent shape and had no rust spots." Dennis told plaintiff that it was his first day on the job as a salesman and that these particular problems with the car could be remedied. At that time the sales manager, named Smitty, approached Dennis and the plaintiff. According to plaintiff,

> "He identified himself by name and said that he was the sales manager. He told Dennis that he would be able to take care of me. When Dennis left, Smitty said that he (Dennis) must have had his cars mixed up; that the car was in 'fine shape'; that there was nothing wrong with the body or transmission; that the car was in excellent condition. I did not ask Smitty about the condition of the engine or the drive train. I believed him because he was the sales manager and because I thought that this was a reputable dealership.
>
> I drove the car. I noticed that the transmission did not shift when it should. I thought there might be something wrong with it. I asked Smitty about this, and he stated that there was nothing wrong, but in any event, he could have the transmission checked out and it would be fixed prior to my purchase of the vehicle."

Prior to agreeing, apparently a few days later, to purchase the automobile, plaintiff asked Smitty "if I could put the car up on a rack so that I could look underneath the car. Smitty stated that it was not the policy of the dealership to allow customers to do this."

When plaintiff inquired about a warranty, "Smitty replied," according to plaintiff's testimony, "that there would be a 'full 30 day

warranty' that covered all moving parts and labor if I were to purchase the Mercedes Benz. Smitty did not tell me that the warranty was only limited to a 10% discount on parts and labor for 30 days." Plaintiff stated that when he signed the "Vehicle Buyer's Order," admitted into evidence as defendant's exhibit No. 2, "it did not contain any notation regarding a '10% discount on parts and labor for work done at Collinsville Volkswagen for 30 days.' I gave it to Smitty. He went into his office, and when he returned, it had that notation on it." On defendant's exhibit No. 2, on which is printed at the top "Vehicle Buyer's Order," appear the words, handwritten in the same color of ink and same size of ball-point pen as the other handwritten notations appearing thereon: "10% Discount Parts and Labor Work done at Coll VW for 30 Days." The order is dated May 31, 1978. Before plaintiff took the car home Smitty told him that the car had been "completely checked out, and that there was nothing wrong with the transmission."

On the second day plaintiff had the car he found that the electric window on the front door of the driver's side of the automobile would not go up and that the automatic transmission did not shift properly. On his way to defendant's place of business to have these problems attended to, the engine began to sputter. Once there, plaintiff told Smitty about these problems, whereupon Smitty provided plaintiff with a tool kit, telling him to fix the window himself. Plaintiff fixed the window after working on it "for several hours." Despite several attempts to speak to Smitty over the course of apparently the next few days, plaintiff was unable to do so. Over the course of the next few weeks plaintiff drove the car 2,600 miles without incident. However, on or about June 27, 1978, the automobile stopped, smoke coming from the engine. Plaintiff and his father examined the car, determined that the oil and water levels were full, and called a tow truck. When the operator of the tow truck arrived and attempted to lift the car by the front bumper, plaintiff and the others present discovered that he could not do so, according to plaintiff's testimony, because

> "the front bumper and body in that area were so rusted that the front bumper would have come off if the tow truck had attached to the front end. We looked underneath the car and observed rust throughout the underside of the car. I also observed a two inch square hole in the driver's floor board. The Mercedes was towed from the rear to the defendant's place of business."

A repair estimate from the defendant, defendant's exhibit No. 1, stated that the engine "[n]eeds overhaul." At that time defendant's

employee informed plaintiff, he testified, that they "do not do any work on Mercedes Benz cars at their dealership. They refused to repair my car."

Upon receiving this information plaintiff had the car towed to Isom's Import Service (hereafter referred to as Isom's) where a minimum of the repairs needed to be made on the car was made at a cost of $753.21, which plaintiff paid in addition to $25 for the cost of towing. Isom's provided plaintiff with an estimate for further repairs to the vehicle totaling $1,925.35, an amount plaintiff could not afford to pay. While the car was at Isom's plaintiff looked underneath the car and found that "the entire underside of the car was rusted and there had been paint sprayed over it to camouflage the rust." The car was unusable for three months while the minimum repairs were made. When plaintiff got the car at the end of the three-month period, he noticed holes in the radiator, which he had repaired at a cost of $43. From the time of that repair through the time of trial three years later plaintiff was unable to drive the automobile, which had been in storage. The attorneys for both parties stipulated that "$10 per day is a usual and reasonable charge for a rental car." Plaintiff said that he had borrowed money to purchase the car and had "incurred interest in the amount of $855.87 in this purchase." Plaintiff testified that he would not have purchased the automobile had it not been for Smitty's statements about the excellent condition of it and the "full warranty" Smitty had given "for all parts and labor for 30 days."

George Gent, plaintiff's father, testified that prior to his son's purchase of the automobile he had examined it and found it in apparently good condition. Smitty told him there would be "a full 30 day warranty on all parts and labor." The witness had driven the car after his son's purchase of it and had experienced difficulty with the transmission. He was aware as well of his son's problems with the car, such as those with the window and engine and for those reasons "asked Smitty if he would be willing to take the Mercedes Benz back and cancel the deal," a proposition which Smitty refused and at which he "laughed." Like plaintiff, the witness had observed smoke coming from the engine. His account of the events thereafter is like that of plaintiff. He said that "[t]he tow truck operator could not tow the vehicle from the front because we found that the body of the car in the area of the bumper and the bumper itself were rusted." The witness was told apparently by defendant's service manager that the engine needed to be overhauled but that defendant "did not do any work on Mercedes Benz cars." While the automobile was at Isom's the witness looked under it and "observed a large amount of rust on the under-

carriage. The rust spots appeared to have been camouflaged by spray paint. I observed that the mounting above the carriage had been rusted through. I observed a hole in the floorboard."

Plaintiff called as a witness Dave Isom, proprietor of Isom's, who testified that the repair bill for the work already done was "reasonable and necessary" and that the estimate was for "necessary and reasonable repairs" to be made on the car.

Defendant called two witnesses, the first of whom was Jim Smith, nicknamed "Smitty," who testified that he was defendant's former sales manager and had sold the automobile to plaintiff. He recalled that "we had a new salesman by the name of Dennis, who had initially talked to the plaintiff, I told Dennis I would finish up on the sale." He said that plaintiff and his father had inquired about a warranty and that he had "told them that there would only be a 10% discount on parts and labor for 30 days from the date of the sale," this being the "standard warranty" offered by defendant on the sale of all used vehicles. He testified that "[a]t no time" had he promised either plaintiff or his father that the warranty would be more extensive than the 10% discount on parts and labor for 30 days and that he had written the terms of the warranty on the vehicle buyer's order prior to plaintiff's signing of it. He stated, "I told them there would be no full warranty, but I did tell them that I would do what I could do to help him out."

The witness testified that he had told plaintiff that the car was in good running condition. He said he had been driving the car for his own personal use for several days prior to the sale without any problems. During that time he had noticed no rust spots on the car and had told plaintiff he knew of no rust problems with it. He testified further that he "had no knowledge of any paint applied to the Mercedes by any employee of defendant or any other person, [sic] designed to hide any rust spots on the Mercedes."

The witness recalled that plaintiff had returned "within a few days after the sale" complaining of a problem with the "right front passenger window." He said that he had gotten a tool set and had "assisted the plaintiff for several hours in fixing the window." He did not recall plaintiff's wanting to see him afterward. Plaintiff's father, he said, had complained to him about the problems plaintiff was having with the car and had asked if the witness would be willing "to cancel the deal and accept the return of the Mercedes Benz." The witness indicated that he had said he could not do so but would "honor our 10% warranty." However, plaintiff's father had refused to accept any repairs done on the car "on that basis." The witness recalled that

"several weeks after the sale" the car had been brought in because of an engine problem. He testified that he

"did not know if Collinsville Volkswagen, Inc. was capable of doing any repairs on a Mercedes Benz. The 10% discount warranty that I gave was for work only to be done at Collinsville Volkswagen. I don't know if Collinsville Volkswagen, Inc. ever did any repair work on Mercedes Benzes."

Defendant called as its other witness its general manager, Merle Cochran, who testified that he had learned that plaintiff's automobile needed an engine overhaul, that he had approved the work, and that he had directed the service department to perform the repairs "in accord with the 30 day, 10% discount on parts and labor warranty." After approving the work, the witness learned that the plaintiff had removed the car from the defendant's premises.

On appeal defendant does not contend that the jury improperly found plaintiff entitled to compensatory damages in any amount; rather, defendant contends that the amount awarded as compensatory damages was against the manifest weight of the evidence. The jury was instructed concerning compensatory damages as follows:

"If you decide for the plaintiff on the question of liability you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages proved by the evidence to have resulted from the wrongful conduct of the defendant:

The purchase price and out of pocket expenses; or, alternatively, the reasonable expense of necessary repairs to the automobile to make it in the condition it was represented to be by the defendant at or before the time of sale.

Damages incidental or as a consequence of the actions of the defendant incurred by the plaintiff, including the expenses of transportation, inspection, or any other reasonable expenses due to the defendant's wrongful conduct.

The reasonable rental of similar property during the time reasonably required for the repair of the property damage.

Whether any of these elements of damage has been proved by the evidence is for you to determine."

Defendant argues that under the first alternative, that is, the sum of the purchase price of the car and out-of-pocket expenses, recovery must be limited to $3,904.75 because "[t]he only out of pocket expenses proved by the appellee was a $25.00 towing bill." However, the record does not support the statement. Plaintiff testified that he had paid $753.21 to Isom's for a minimum of necessary repairs. The

order for repairs in that amount which is marked "Paid," is included in the record as plaintiff's exhibit No. 1. Plaintiff testified further that he had paid $43 to repair the holes in the radiator that he had discovered after the "minimum" repairs had been made.

Defendant points out that the note and security agreement, entered into evidence as plaintiff's exhibit No. 19, indicate an interest charge of $855.87 on a loan of $3,868.41, which is about three times more than the amount plaintiff actually borrowed to buy the Mercedes. The record indicates that plaintiff paid $3,879.75 for the Mercedes and borrowed only $1,379.75 of the entire amount of $3,868.41 in order to purchase that particular car, after receiving $2,500 from defendant as a trade-in allowance. We agree with defendant that the full amount of the interest charge cannot be considered a consequence of defendant's conduct and that, as a result, interest on the amount of the loan used by plaintiff for purposes other than the acquisition of the Mercedes may not be deemed an element of plaintiff's damages. Since $1,379.75 is approximately 35% of $3,868.41, the amount of interest properly includable as an element of plaintiff's damages is 35% of $855.87, or approximately $300.

■ Defendant objects to any recovery by plaintiff in damages for the "reasonable rental of similar property" for the reason that plaintiff introduced no evidence that he did, in fact, rent any similar property or that he even needed to do so. Plaintiff relies on *McCabe v. Chicago & Northwestern R.R. Co.* (1919), 215 Ill. App. 99, and the recent case of *Fairchild v. Keene* (1981), 93 Ill. App. 3d 23, 416 N.E.2d 748, which followed *McCabe,* for the proposition that the reasonable cost of renting a substitute vehicle may be considered as damages for the loss of the use of a vehicle although the plaintiff did not, in fact, rent a substitute vehicle and the vehicle was not to be used commercially. In *McCabe* a plaintiff whose pleasure car had been unreasonably delayed in shipping by the defendant was permitted to recover for the delay upon the basis of the reasonable rental value of a similar vehicle although none was actually rented. In *Fairchild* the court noted the paucity of precedent on the question of whether a substitute chattel needs actually to have been rented but "[saw] no reason to reject McCabe," concluding that "[t]o require the actual rental of a vehicle in order for the measure to apply would merely assure that most injured owners would do so," that "[t]hose who could not afford to advance the money would be unfairly prejudiced," and that "[n]o substantial reduction in the economic costs of automobile collisions would result." (93 Ill. App. 3d 23, 24, 416 N.E.2d 748, 749.) We adopt the reasoning of *Fairchild* and consequently conclude that the reasonable rental ex-

pense of a substitute vehicle was properly considered by the jury as an element of plaintiff's damages although plaintiff did not show that he had, in fact, rented such a vehicle.

■ The attorneys for the parties stipulated to $10 a day as a reasonable charge for a rental vehicle, and the record shows that the plaintiff was unable to use the Mercedes for a total of approximately $3\frac{1}{4}$ years between the time of purchase and the time of trial, that is, for the three months during which the "minimum" repairs were being made and the approximately three years the car was in storage, following the repair of the radiator, because plaintiff could not afford to pay the $1,925.35 required to make further necessary repairs. At $10 per day for $3\frac{1}{4}$ years, the rental expense of a substitute vehicle would be about $11,860, a figure almost twice the amount awarded by the jury to compensate plaintiff for all his damages. If the jury awarded in damages $3,879.75 for the purchase price of the vehicle, $25 for towing, $753.21 for the "minimum" repairs, $43 for the repair of the radiator and $300 for interest on the loan, which comes to a total of $5,000.96, it allowed only about $1,000 as the reasonable rental expense of a substitute vehicle. Even if the paid-for repairs of $753.21 and $43 were not included by the jury under the first alternative because they were deemed by the jury to be includable under the second alternative of "the reasonable expense of necessary repairs to the automobile to make it in the condition it was represented to be by the defendant at or before the time of sale," the jury would have awarded about $1,800, or only about 15% of the amount it could have awarded for the reasonable rental value of a substitute vehicle. For these reasons we must disagree with defendant in his contention that the award of $6,000 as compensatory damages was against the manifest weight of the evidence.

■ ■ As to the issue defendant raises concerning punitive damages, he questions not the amount of such damages but the propriety of any award at all for them. Defendant maintains that Jim Smith's representations concerning the condition of the car may be seen "at worst" only as negligent and that "although this obvious controversy between the parties [concerning the terms of the warranty] was apparently resolved by the jury in favor of appellee there is no indication of malice or reckless conduct by appellant sufficient to justify punitive damages." It has long been established in Illinois that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression or when the defendant acts wilfully or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Kelsay v. Motorola,*

*Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) When such damages may be assessed, they are allowed in the nature of punishment and example to deter the wrongdoer and others from committing like offenses in the future. (*Kelsay.*) Because of the penal nature of such damages, however, the law disfavors them and requires courts to exercise caution that they not impose punitive damages improperly or unwisely. (*Kelsay.*) Each case must be considered in its own context in determining entitlement to and amount of punitive damages. *Stambaugh v. International Harvester Co.* (1982), 106 Ill. App. 3d 1, 435 N.E.2d 729.

■ There is no need to reiterate the facts stated above that are relevant to this issue. The record is replete with evidence by which the jury could, and plainly did, conclude that the defendant, through one or more of its agents or employees, acted with fraud, or wilfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. Therefore, an award of punitive damages in some amount was not against the manifest weight of the evidence. However, we think the amount assessed by the jury is excessive. Although the acts that the jury believed defendant had committed justify the imposition of punitive damages, we think, given the amount of the award of compensatory damages, that an award of punitive damages in the amount of $3,000 is sufficient to deter the defendant as well as others from committing like offenses in the future. Therefore, the judgment for punitive damages is reduced from $12,000 to $3,000.

With respect to the third and final issue presented for review, defendant contends that attorney fees are in the nature of damages and, as such, "are a matter for the jury to decide, as in the case of all damages claimed in a jury trial." Our review of the record on appeal, however, discloses that defendant has raised the issue for the first time on appeal, no objection of record having been made prior to the notice of appeal. An issue not raised in the trial court is waived for review, a rule so familiar that it requires no citation.

Judgment for compensatory damages and attorney fees affirmed; judgment for punitive damages reduced to $3,000.

KARNS and KASSERMAN, JJ., concur.