(No. 75013.—

JOHN R. MARTIN, On His Own Behalf and On
Behalf of All Others Similarly Situated, Appellee,
v. HEINOLD COMMODITIES, INC., Appellant.

*Opinion filed September 22, 1994.—Rehearing denied
December 5, 1994.*

FREEMAN, J., joined by McMORROW, J., concurring in part and dissenting in part.

William J. Nissen, Thomas K. Cauley, Jr., Joseph D. Kearney and Robert M. Hatch, of Sidley & Austin, of Chicago, for appellant.

William J. Harte, Ltd., and Plotkin & Jacobs, Ltd., of Chicago (William J. Harte, John G. Jacobs, Jonah Orlofsky and Joshua Karsh, of counsel), for appellee.

JUSTICE NICKELS delivered the opinion of the court:

Defendant, Heinold Commodities, Inc., appeals from an appellate court decision affirming in part and reversing in part a judgment entered for plaintiffs and

against defendant. Plaintiff filed a four-count complaint against Heinold for breach of fiduciary duty and violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1979, ch. 121$^1$/2, par. 261 *et seq.*). Plaintiff's suit alleged that Heinold had misrepresentated the nature of a "foreign service fee" in the sale of London Commodity Options (LCO's) to class members from September 12, 1977, through May 31, 1978. On remand from this court in a previous appeal, the trial court found for the plaintiff class (hereinafter, plaintiffs) on both the breach of fiduciary counts and Consumer Fraud Act counts. The trial court also awarded plaintiffs punitive damages and prejudgment interest under both claims. The appellate court affirmed the award of compensatory damages, but reversed the award of punitive damages under both claims. The appellate court also reversed the award of prejudgment interest under the Consumer Fraud Act. We granted leave to appeal (134 Ill. 2d R. 315).

## BACKGROUND

This is the second time this case has reached this court. Plaintiff, John Martin, originally filed a four-count complaint against Heinold for breach of fiduciary duty and for violation of the Consumer Fraud Act in 1980. Plaintiff alleged that Heinold had intentionally misrepresented the nature of a "foreign service fee" charged in connection with the sale of LCO's. The action was subsequently certified as a class action. After initial discovery, plaintiff moved for summary judgment on the fiduciary duty counts. The trial court granted plaintiffs' motion, finding a fiduciary relationship between Heinold and plaintiffs as a matter of law and that Heinold had breached its fiduciary duties to plaintiffs.

The appellate court reversed the trial court's decision finding a fiduciary relationship as a matter of law.

On appeal from the appellate court, this court affirmed on that matter, and found a material question of fact to exist as to whether, at the time Heinold discussed its compensation with plaintiffs, a fiduciary duty existed for Heinold to breach. This court remanded for a factual determination as to whether a preagency fiduciary relationship existed between Heinold and plaintiffs at the time Heinold's compensation was discussed. *Martin v. Heinold Commodities, Inc.* (1987), 117 Ill. 2d 67.

### Trial Court's Findings on Remand

On remand, the trial court made the following findings of fact and law.

### Findings of Fact

LCO's were commodity option contracts obtained in London, England. The purchaser of such option had the right, but not the obligation, to buy or sell a commodity futures contract at a certain price. This right to either purchase or sell a futures contract was of limited duration, after which time the option would expire and become worthless. Purchasers of such options would only profit if the market moved favorably in their direction, enough to offset the price of the option plus any transaction costs. At that time, purchasers could buy or sell a futures commodity contract at a profit.

The Commodity Futures Trading Commission (Commission), a Federal commission established to regulate commodity and futures trading, banned the sale of LCO's effective June 1, 1978. The Commission's ban was necessitated by the fact that an overwhelming majority of firms engaged in the sale of LCO's at that time were employing fraudulent or unlawful practices. One of the specific practices cited by the Commission in banning the sale of LCO's was the use of terms such as "foreign service fee" to conceal markups. The Commission noted:

"The fact most scrupulously concealed by the vast major-

ity of firms is the full extent of fees and mark-ups. \*\*\* [The firms' confirmation statements] uniformly avoid disclosure and in fact conceal such fact by using various explanations or definitions. Mark-ups frequently are defined in promotional materials and customer confirmations as \*\*\* [*inter alia*] 'foreign service fees' \*\*\*." 43 Fed. Reg. 16162 (1978).

The trial court made the following specific findings concerning the trading of LCO's:

"[Trading was] an extremely complex undertaking for investors, with little or no information available to American purchasers from any source other than from their brokers. The mechanics of the options themselves, the workings of the various London exchanges, the impact of currency conversion rates, the lack of information concerning the underlying commodities and other factors all made LCO investing exceedingly complicated. Investing in LCOs \*\*\* was more complicated and much less understood than the trading of securities.

During the relevant period, it was difficult for customers to compare potential transactions effected through different brokers. One of the problems causing such difficulty was that different brokers used differing terminology.

During the relevant period, potential customers were completely dependent upon the LCO broker for information about fees and commissions charged in connection with LCO transactions; during the relevant period, the investor was at the mercy of the broker to learn what the expenses charged in London were, and had to rely upon the broker to state very clearly what the compensation to the broker was, since the customer had no other source for such information.

During the relevant period, virtually no investor in America, regardless of how sophisticated, could truly understand London commodity options trading without the help of a broker. \*\*\* During the relevant period, customers were uniquely dependent upon, and at the mercy of, their brokers in obtaining information relative to such transactions.

The Plaintiff class has established by clear and convinc-

ing evidence that during the relevant period the creation of the customer-broker relationship between Heinold and its LCO customers involved a special trust and confidence on the part of the customer in the subsequent fair dealing of Heinold."

In opening an LCO account, each class member executed a customer agreement and statement signifying that he or she had received and understood a summary disclosure statement from Heinold regarding LCO's. Two forms of summary disclosure statements were used by Heinold during the relevant time. The first was a typewritten form and the second was a printed form. Both forms indicated that the entire price of an LCO consisted of three components: (1) a premium for the option; (2) a commission; and (3) a foreign service fee. The typewritten version of the summary disclosure statement described the commission and foreign service fee as follows:

"[Heinold] adds a foreign service fee equivalent to 20% of the premium as well as $1/2$ the commodity futures commission rate normally charged on futures transactions. These charges have the following purpose: to recover costs of telephone, telex, bookkeeping, floor brokerage, clearing fees, costs involved with the segregation of customer funds and use of Heinold funds to pay for London Commodity Options, and research costs involved with options transactions; as well as to compensate [Heinold] and the registered representative who services the options customer during the life of options for conducting such business."

The printed version was virtually identical to the typewritten disclosure form, except that the foreign service fee was changed from 20% of the premium to $1,200. The printed form also noted that the foreign service fee for options with shorter lives would be smaller.

The trial court further found that Heinold could operate profitably on LCO transactions by charging only the price of a standard commission. The court arrived at

this by noting that Heinold believed it could operate profitably by charging, and in fact only charged, a commission, and no foreign service fee, on London *futures*, the mechanics of which were indistinguishable from LCO's. Because Heinold had determined that it could pay all costs, compensate the registered representative who serviced the customer's account and still operate profitably by charging only a flat commission on a futures position, the trial court found the charging of a foreign service fee on LCO's a means by which to receive additional compensation for services already covered by the commission. The court further found that Heinold offered no credible explanation for the assessment of the foreign service fee. In fact, the foreign service fee was treated by Heinold internally as a commission.

The court further found that the word "commission" has a commonly understood meaning: a broker's compensation for a transaction as well as payment for the broker's general overhead. However, the term commission is not usually meant to include a broker's out-of-pocket expenses paid to third parties in connection with a particular transaction. In contrast to the understood meaning of commission, the court noted that the term foreign service fee has no common understanding. Thus, the court found that Heinold's use of the term "foreign service fee" was intended to give, and did give, the impression that this fee was not what would normally be known as a commission but, instead, was an additional expense the broker necessarily incurred in the transaction and had to pay to third parties.

The trial court found Heinold's use of the term foreign service fee misleading and deceptive. This information was material to the investor, the court found, and Heinold knew it would be material. The court also found that during the relevant period, Heinold sought

to instill confidence in the investing public by conveying to its customers that, unlike other firms, it was not charging exceedingly high commissions and markups on its LCO's. In fact, through the use of the foreign service fee, Heinold accomplished the very same thing.

The trial court concluded that investors would not have engaged in LCO trading through Heinold had they known the true purpose of the foreign service fee. The court then determined that the relief sought by the class, which involved determining how the monies deposited by the class in their Heinold accounts was used and what losses were suffered, required an equitable accounting. The court accepted the parties' stipulation concerning the total amount of money plaintiffs paid to Heinold for the LCO's, $1,728,948.27, of which $597,800 was payment for foreign service fees.

### Findings of Law

The trial court found that a preagency fiduciary relationship existed between Heinold and plaintiffs. Thus, Heinold was under an affirmative duty to inform plaintiffs at the time LCO's were discussed all material facts concerning its compensation. Heinold did not disclose all material facts concerning its compensation and thus violated its fiduciary duty to plaintiffs. The court also noted that but for Heinold's misrepresentations, plaintiffs would not have purchased LCO's through Heinold. The court found this sufficient causation to award plaintiffs their full investment losses. The court further found an additional reason to award plaintiffs their full investment losses irrespective of causation: breaches of fiduciary duty with bad faith and malice. The court next found that Heinold violated the Consumer Fraud Act and awarded the same amount of damages.

Next, the court found that an award of prejudgment interest was proper under both the breach of fiduciary duty counts and the Consumer Fraud Act. The court also awarded punitive damages under both claims.

The appellate court affirmed the trial court's decision in part, and reversed concerning the award of punitive damages and the award of prejudgment interest under the Consumer Fraud Act.

## ISSUES

Heinold presents four issues for review and argues that the appellate court erred in: (1) finding a preagency fiduciary duty; (2) holding that Heinold violated the Consumer Fraud Act; (3) upholding a damages award of investment losses where no proof of loss causation was shown; and (4) holding Heinold had no right to a jury trial on plaintiffs' Consumer Fraud Act or fiduciary duty claims. Plaintiffs have requested cross-relief, arguing that the appellate court erred in: (1) reversing the trial court's award of punitive damages, and (2) reversing the trial court's award of prejudgment interest under the Consumer Fraud Act.

## I.

### Preagency Fiduciary Duty

We first address Heinold's contention that the appellate court erred in affirming the trial court's finding that Heinold owed plaintiffs a preagency fiduciary duty. Heinold argues: (1) plaintiffs did not prove such a duty; and (2) the appellate court erred in creating a new basis for the existence of a fiduciary duty in focusing on the complexity of the LCO transactions rather than on any relationship between the parties.

In *Martin*, 117 Ill. 2d 67, this court remanded the cause to the trial court to make a factual determination as to whether Heinold owed plaintiffs a preagency fiduciary duty at the time Heinold discussed its compensation with plaintiffs. In doing so, this court noted the general rule that

"an 'agent is subject to no fiduciary duty in making the agreement by which he becomes [an] agent and may there-

after act in accordance with its terms.' (Restatement (Second) of Agency sec. 389, comment b (1958) ***.)" (*Martin*, 117 Ill. 2d at 78.)

However, this court also adopted the exception to this rule found in the Restatement:

"[W]e are unwilling to conclude, as a matter of law, that a fiduciary duty can never be imposed upon a prospective agent prior to the formal creation of an agency relationship. Thus, while the general rule governing preagency contracts does not require disclosure of the terms of a prospective agent's compensation, we believe that facts could be established which would support imposition of a fiduciary duty upon a prospective agent applicable to preagency contracts. ***

***

We also note that, where the very creation of the agency relationship involves a special trust and confidence on the part of a principal in the subsequent fair dealing of an agent, the prospective agent may be under a fiduciary duty to disclose the terms of his employment as an agent. (Restatement (Second) of Agency sec. 390, comment e (1958) ***.)" *Martin*, 117 Ill. 2d at 78-79.

### *Whether Plaintiff Class Failed to Prove Relevant Factors*

Heinold first argues that plaintiffs failed to prove relevant factors from which the court could find an exception to the general rule that no fiduciary duty exists at the time an agent's compensation is negotiated prior to the existence of the agency relationship. Heinold argues:

"A fiduciary relationship exists where there is special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. It exists where confidence is reposed on one side and resulting superiority and influence is found on the other. [Citations.] The relationship may exist as a matter of law between attorney and client, guardian and ward, principal and agent, and the like, or it may be moral, social, domestic,

or even personal. Where the relationship does not exist as a matter of law or is sought to be established by parol evidence, the proof must be clear, convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion." (*Kolze v. Fordtran* (1952), 412 Ill. 461, 468.) Heinold further notes the factors to be considered when determining whether a fiduciary relationship exists where one does not exist as a matter of law:

"When a confidential or fiduciary relationship does not exist as a matter of law, it must be proved by clear and convincing evidence in order to establish a basis for raising a constructive trust. Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party entrusted the handling of his business and financial affairs to the other and reposed faith and confidence in him. [Citation.]" (*Cunningham v. Cunningham* (1960), 20 Ill. 2d 500, 504.)

Heinold argues that none of the factors pertinent to a showing of fiduciary duty were shown by the plaintiffs.

While Heinold correctly cites the law applicable in instances where no fiduciary relationship exists as a matter of law and must be proven by facts, it does not focus on the law applicable here, where a future principal and agent are discussing terms of the agency, specifically compensation, for a relationship that will be fiduciary as a matter of law. Restatement (Second) of Agency, section 390, comment *e*, adopted by this court in the previous appeal, addresses this specific factual situation and provides:

"If *** the creation of the relation involves peculiar trust and confidence, with reliance by the principal upon fair dealing by the agent, it may be found that a fiduciary relation exists prior to the employment and, if so, the agent is under a duty to deal fairly with the principal in arranging the terms of the employment." (Restatement (Second) of Agency § 390, Comment *e* (1958).)

We find this to be a different inquiry than the factual

inquiry on which Heinold relies. While the general inquiry determines whether a fiduciary relationship exists at all, the inquiry here determines at what time that relationship attached concerning the agent's disclosures about his compensation. Thus, while Heinold argues that the inquiry must include a determination as to the parties' relationship, that relationship is already known: future principal and agent discussing the agent's compensation. And, while Heinold argues that the evidence did not show that it accepted the trust and confidence plaintiffs placed in it, this inquiry is not required under comment *e*. All that is required is that the *creation* of the agency relationship involve peculiar trust and confidence, with reliance by the principal on the fair dealing by the agent. This is a factual determination to be made by the trial court. The trial court found peculiar trust and confidence to exist here, and we cannot say that the court's finding was manifestly erroneous. Findings of fact will not be overturned on appeal "unless they are palpably against the weight of the evidence, even though we might be inclined to find otherwise." *Kolze*, 412 Ill. at 468-69.

Plaintiffs' evidence demonstrated that few, if any, investors at the time could understand the complexities of LCO transactions, including the mechanics involved in the purchase and trading of such commodities. Because of this, the trial court found that plaintiffs could not have known what expenses a broker would incur in the overseas transactions and subsequently pass on to the investors. As the trial court found, plaintiffs were "at the mercy of the broker to learn what the expenses charged in London were, and had to rely upon the broker to state very clearly what the compensation to the broker was." Moreover, plaintiffs could not determine this information from other brokers because brokers used different terminology for their fees. Thus, plaintiffs

had a peculiar trust and confidence in Heinold during these negotiations and relied on Heinold to deal fairly. It should also be noted that Heinold failed to present any evidence to contradict plaintiffs' evidence on this point.

Heinold relies heavily on *Apple v. Apple* (1950), 407 Ill. 464, where the issue was whether a fiduciary relationship existed prior to one party's granting another party the power of attorney, which resulted in a fiduciary relationship as a matter of law. We note, however, that *Apple* is not controlling here because: (1) *Apple* did not involve negotiations for compensation prior to an agency relationship, and (2) this court had not yet adopted comment *e* to section 390 of the Restatement.

### *Whether the Appellate Court Erred in Affirming the Trial Court*

Heinold also argues that the appellate court erred in holding that a fiduciary duty exists simply where the subject matter of a contract is complicated. Heinold's argument is based on its belief that the traditional criteria for the existence of a fiduciary duty were not met here and that the appellate court created a new. basis on which to find a fiduciary duty. The appellate court affirmed the trial court on this point, stating:

> "The record indicates that members of the Class were uniquely dependant upon information obtained from defendant and its soliciting brokers in order to make a profit on LCO transactions. The trading of LCO's during the relevant period was exceedingly complicated due to the mechanics of LCO's and the London exchanges, the volatility of the commodity options market, the impact of currency conversion rates and the differing terminology used among brokers offering LCO's to the public." (240 Ill. App. 3d 536, 541.)

The appellate court's opinion merely summarizes the trial court's findings that few investors, including plaintiffs, could have understood the mechanics of LCO

trading or known what type of charges were proper. The appellate court's finding is not that a preagency fiduciary duty attaches when a transaction is complex, but that under these unique circumstances, where a future principal and agent are discussing compensation, and where the plaintiffs were uniquely dependant upon Heinold for information concerning the proper charges in the transaction, a duty attached. There was no error by the appellate court on this issue.

## II.

### Consumer Fraud Act

Heinold next argues that the appellate court erred in affirming the trial court's finding that Heinold violated the Consumer Fraud Act through the use of its misleading summary disclosure statement. Heinold argues that it literally complied with the Commission's disclosure regulations by disclosing the various elements of the LCO's, and thus could not have violated the Consumer Fraud Act.

Heinold first argues that the Consumer Fraud Act does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." (815 ILCS 505/10b(1) (West 1992).) Moreover, Heinold argues, this court has held that "compliance with the disclosure requirements of [Federal statutes and regulations] is a defense to liability under the Illinois Consumer Fraud Act." *Lanier v. Associates Finance, Inc.* (1986), 114 Ill. 2d 1, 18.

In addition to arguing that it listed all the elements comprising the purchase price of the LCO's in its summary disclosure statement as required by the Commission's regulations, Heinold also notes the great lengths to which it went in order to ensure that all disclosures were made. Thus, Heinold asserts, it could not have violated the Consumer Fraud Act.

Heinold's deception was neither specifically authorized by the Commission, nor in compliance with the Commission's regulations. The Commission has noted that literal compliance with disclosure regulations will not necessarily ensure that a violation of the Commission's regulations has not occurred. In certain circumstances, "a customer may be deceived about [material facts] despite receipt of the information required by [the Commission's regulations]." (*Hammond v. Smith Barney, Harris Upham & Co.* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) par. 24,617 (C.F.T.C. 1990).) In *Hammond,* the Commission noted that it had reviewed "the overall message conveyed by" the solicitation in question in determining whether a violation of Commission disclosure regulations had occurred. It has also been noted:

"[I]nformation is imparted not just through the use of individual words—information is also gained from the context in which those words are placed. When determining what has been disclosed, therefore, it is wrong to treat each individual piece of information separately, as if it had no relation to the other pieces which surround it." *Isquith v. Middle South Utilities, Inc.* (5th Cir. 1988), 847 F.2d 186, 201 n.9.

The pertinent Commission regulations are found at section 32.5 of the Code of Federal Regulations:

"(a) Except as provided in paragraph (b) of this section, prior to the entry into a commodity option transaction, each option customer or prospective option customer shall be furnished a summary disclosure statement by the person soliciting or accepting the order therefor. The disclosure statement shall contain the following:

(1) A brief description of the commodity option transactions being offered including:
  ***

(ii) A listing of the elements comprising the purchase price to be charged, including the premium, mark-ups on the premium, costs, fees and other charges, as well as the method by which the premium is established;

(iii) The services to be provided for the separate elements comprising the purchase price \*\*\*." 17 C.F.R. § 32.5(a)(1) (1977).

As the trial court found, "Heinold's Summary Disclosure Statement, which concealed and failed to disclose an additional commission by using the misleading and deceptive term 'Foreign Service Fee,' failed to satisfy these requirements." By labeling a commission a foreign service fee rather than an additional commission, Heinold deceived the plaintiff class into believing the foreign service fee was an additional separate charge Heinold necessarily incurred and paid to third parties in LCO transactions.

Moreover, we note that Commission regulation 32.9 provides:

"It shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever; in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction." (17 C.F.R. § 32.9 (1977).)

Again, as the trial court noted, "Heinold violated this provision when it cheated, defrauded and deceived the class."

We note that this finding is supported by the fact that the Commission banned the offer and sale of commodity options, including LCO's, to the general public effective June 1, 1978. This ban was due, *inter alia*, to the fact that firms were using such terms as "foreign service fee" to conceal the true extent of fees and markups. 43 Fed. Reg. 16162 (1978).

Heinold also argues that the Commission inspected its summary disclosure form and did not object to the

foreign service fee. Thus, Heinold argues, the disclosure was proper. This argument is without merit, as is seen by the following which Heinold was required to have printed on the summary disclosure form:

"THESE COMMODITY OPTIONS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE COMMODITY FUTURES TRADING COMMISSION *NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS STATEMENT.* ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF THE COMMODITY EXCHANGE ACT AND THE REGULATIONS." (Emphasis added.)

Heinold also argues that the appellate court erred in holding that Heinold violated the Consumer Fraud Act "because [the summary disclosure statement] does not disclose the full extent of compensation [Heinold] derived in LCO transactions." (240 Ill. App. 3d at 544.) Heinold argues that it was impossible to know and disclose at the time plaintiffs signed the summary disclosure forms how much compensation Heinold would derive from the transaction. Heinold also argues that the Commission's regulations do not require that it state the full amount of its compensation. However, we simply note that Heinold's deception was not in failing to disclose the *exact* amount of its compensation, but in failing to disclose that the foreign service fee was a commission, from which it would derive compensation. We further note the ease with which Heinold could have avoided this deception. Heinold could have simply informed the plaintiff class that the foreign service fee was an additional commission, which is how Heinold treated it internally.

III.

Proximate Cause

We next address Heinold's argument that the appellate court erred in affirming the trial court's award

of full investment losses where no proof of loss causation existed. In finding causation sufficient to award plaintiffs their full investment losses, the trial court found: (1) plaintiffs would not have engaged in LCO trading through Heinold had they known the truth about the foreign service fee; and (2) but for Heinold's misrepresentations, plaintiffs would not have suffered their losses. The trial court also awarded plaintiffs full investment losses irrespective of causation, due to Heinold's bad-faith breach of its fiduciary duty.

The appellate court affirmed and noted that proximate causation is a necessary element under the fiduciary duty and Consumer Fraud Act counts. The appellate court found proximate causation had been shown for plaintiffs' full investment losses, in that class members would not have purchased LCO's through defendant had they known the truth about the foreign service fee. In so finding, however, the appellate court also noted that " 'neither [defendant's] representations concerning the foreign service fee nor its use of that fee had any effect on the value, risk or profit potential of [LCO's].' " 240 Ill. App. 3d at 545.

Heinold argues that in Illinois, as in most jurisdictions, a " 'fundamental principle' of tort law" is that a plaintiff must prove a defendant's actions proximately caused the plaintiff's injury. Heinold adopts the Federal courts' term "loss causation" to refer to proximate causation in securities cases. Heinold further argues that plaintiffs failed to prove loss causation and that its conduct did not proximately cause plaintiffs' damages. Plaintiffs respond that Heinold's version of causation is not the law in Illinois for intentional breaches of fiduciary duty or for recovery under the Consumer Fraud Act. Plaintiffs argue that, in Illinois, all that need be shown is a "but for" causation. Plaintiffs further argue that, although not required, they have proven loss causation.

We first note that plaintiffs requested both equitable and legal relief in their complaint. Plaintiffs sought the imposition of a constructive trust and an accounting for Heinold's breach of its fiduciary duties, and included a count in tort under the Consumer Fraud Act. Heinold argues that proximate cause is a requirement in tort law, but does not address plaintiffs' equitable claims in their briefs. Plaintiffs respond to Heinold's argument regarding proximate causation, but further argue that the law of trusts as well as the equitable remedy of rescission are applicable here. We find it necessary to address both the equitable and legal issues in order to arrive at the proper amount of plaintiffs' recovery. As we will note, the distinction is important, as it determines the focus of what is being sought as recovery.

*Equitable Claims: Constructive Trust, Accounting, Rescission*

Plaintiffs' first two counts alleged the breach of Heinold's fiduciary duties and sought the imposition of a constructive trust on the foreign service fees plaintiffs paid to Heinold and an accounting in order to recover their full investment losses. The trial court imposed a constructive trust over plaintiffs' entire investment losses and also noted that plaintiffs were entitled to an accounting. The trial court found that under section 205 of the Restatement (Second) of Trusts, causation need not be shown for plaintiffs to recover their full investment losses. (Restatement (Second) of Trusts § 205 (1959).) The trial court further found sufficient causation in that, but for Heinold's breach, plaintiffs would not have lost their money.

Plaintiffs argue that the trial court was correct in relying on section 205 of the Restatement (Second) of Trusts and that, under the Restatement, proximate cause need not be shown for them to recover their full investment losses. Instead, plaintiffs argue, under the

law of trusts, only a "but for" causation test applies: but for Heinold's misrepresentation, plaintiffs would not have lost their money. Plaintiffs conclude that "[t]he liability of fiduciaries to investors for full investment losses, without any proof at all of 'loss causation,' is well established."

We disagree. While making no determination as to the accuracy of plaintiffs' argument concerning causation and section 205 of the Restatement (Second) of Trusts, we do note that the Restatement of Trusts is not applicable to constructive trusts. The Restatement (Second) of Trusts specifically states:

"The rules applicable to constructive trusts *** are not dealt with in the Restatement of this Subject. These rules are dealt with in the Restatement of Restitution." (Restatement (Second) of Trusts § 1, at 5 (1959).)

The reason for this has been noted by this court:

"An express trust is based upon the intention of the parties, while a constructive trust is a distinctly different concept. It arises, not out of an agreement or intention, but by operation of law ***." (*Swanson v. Randall* (1964), 30 Ill. 2d 194, 199.)

We must thus look to the Restatement of Restitution.

Section 9 of the Restatement of Restitution, dealing with causation, provides:

"(1) A person who has conferred a benefit upon another because of a mistake, whether or not the mistake was induced by fraud or misrepresentation, is entitled to restitution only if the mistake caused the conferring of the benefit." (Restatement of Restitution § 9 (1937).)

In the instant case, the mistake, plaintiffs' belief that the foreign service fee was a charge Heinold necessarily incurred in LCO transactions and not a commission, induced by Heinold's deception, caused plaintiffs to confer a benefit on Heinold.

The Restatement of Restitution also specifies that a constructive trust is imposed to recover any illegal benefit a breach of fiduciary duty may have given the fidu-

ciary. Section 160 of the Restatement of Restitution provides:

> "Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." (Restatement of Restitution § 160 (1937).)

Comment *c* to section 160 states:

> "A constructive trust is imposed upon a person in order to prevent his unjust enrichment. To prevent such unjust enrichment an equitable duty to convey the property to another is imposed upon him." (Restatement of Restitution § 160, Comment *c* (1937).)

Thus, a constructive trust is imposed to prevent unjust enrichment by imposing a duty on the person receiving the benefit to convey the property back to the person from whom it was received. (See also *Swanson*, 30 Ill. 2d at 199.) We must now determine what benefit plaintiffs conferred on Heinold, or on what funds the constructive trust was properly imposed.

The price of an LCO consisted of three items: (1) a premium for the option; (2) a commission; and (3) a foreign service fee. The benefit Heinold received from plaintiffs was the commission and foreign service fee. Heinold received no benefit, or profit, from the money actually paid for the LCO, which went to the party in London acquiring the LCO for plaintiffs. Thus, under plaintiffs' breach of fiduciary duty claim seeking a constructive trust, the amount plaintiffs may recover is the amount Heinold received in commissions and foreign service fees.

Plaintiffs also sought to recover their full investment losses through an accounting due to Heinold's breaches of its fiduciary duties. We note, however, that an action for accounting is similar to an action to impose a constructive trust in that the action seeks the return of any benefit, or profit, conferred upon the breaching party. "Accounting holds the defendant liable for his

profits, not for damages. The ground of this liability is unjust enrichment." (1 D. Dobbs, Law of Remedies § 4.3(5), at 611 (2d ed. 1993).) As this court has observed in an action for an accounting: "it is gain to the agent from the abuse of the relationship that triggers the right to recover, rather than loss to the principal." *City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 565-66.

Plaintiffs also argue that Heinold is liable for full investment losses because it acted in bad faith and self-dealed. Plaintiffs argue that when a fiduciary acts in bad faith, or for his own benefit, all ensuing losses are recoverable, regardless of their causal connection to the breach. The traditional remedy in such instances, plaintiffs argue, is to set aside the entire transaction.

What plaintiffs argue for is rescission of their contract with Heinold for its breach of its fiduciary duty. In *Moehling v. W.E. O'Neil Construction Co.* (1960), 20 Ill. 2d 255, this court stated:

"It has long been the settled law in this jurisdiction that *** [w]here *** a reasonable suspicion exists that the confidential relation has been abused, the contract or transaction will be set aside ***." (*Moehling*, 20 Ill. 2d at 266-67.)

However, this court has also stated:

" 'It is a general rule, to which there are but few exceptions, that the restoration of the party against whom the relief is sought, or the offer to restore him, to the position which he occupied before the transaction complained of took place, is a condition precedent to the right to rescind. The right can be exercised only upon the terms of returning the consideration received, or, perhaps, under certain circumstances, of returning its value.' " (*Naugle v. Yerkes* (1900), 187 Ill. 358, 365, quoting *Rigdon v. Walcott* (1892), 141 Ill. 649, 661.)

This court has also stated:

" 'A party cannot rescind a contract of sale, and at the same time retain the consideration he has received. ***

He must put the other party in as good a condition as he was before the sale, by a return of the property purchased.' " *Buchenau v. Horney* (1851), 12 Ill. 336, 338.

Thus, rescission of a contract in Illinois will only be allowed where both parties are able to place each side *in statu quo*. Plaintiffs are not entitled to a rescission of their contracts with Heinold. Plaintiffs have received and used the benefit for which they bargained, the use of the LCO's. Thus, plaintiffs cannot return Heinold to as good a condition as it was before the sale. There is nothing left to return.

### Consumer Fraud Act

Unlike an equitable suit seeking the imposition of a constructive trust or an accounting, a suit in tort seeks damages, measured not by the profit to the defendant but by the amount necessary to properly compensate the plaintiff for his loss. (See 1 D. Dobbs, Law of Remedies § 3.1, at 278 (2d ed. 1993); *Commercial National Bank v. Federal Deposit Insurance Corp.* (1985), 131 Ill. App. 3d 977, 984.) We now determine whether plaintiffs may recover their full investment losses in tort under the Consumer Fraud Act.

As noted, Heinold argues that plaintiffs were required to prove "loss causation" in order to recover for damages. Plaintiffs reply that they were not so required, especially since the action was brought under the Consumer Fraud Act. We first address the issue of what type of causation plaintiffs must show to recover for misrepresentation. This court has previously stated:

"It is a fundamental principle applicable alike to breaches of contract and to torts, that in order to found a right of action there must be a wrongful act done and a loss resulting from that wrongful act; the wrongful act must be the act of the defendant, and the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act." (*Town of Thornton v. Winterhoff* (1950), 406 Ill. 113, 119.)

This principle is applicable to actions for negligence as well as intentional torts, such as fraud:

"[I]t is a well settled principle in regard to false representations, that fraud without damage is neither sufficient to support an action at law, nor a ground for relief in equity. Fraud and injury must concur to furnish a ground for judicial action. In an action for fraudulent representations, the plaintiff must not only show, that the representations were made, and that they were false and fraudulent, but he must also show affirmatively that he has been injured thereby. [Citations.]" *Jones v. Foster* (1898), 175 Ill. 459, 469.

As has been more recently noted by our appellate court in an action for an intentional tort, fraud: "damages *** must be a proximate, and not remote, consequence of the fraud." (*Brown v. Broadway Perryville Lumber Co.* (1987), 156 Ill. App. 3d 16, 25; see also W. Prosser, Torts § 110, at 732 (4th ed. 1971) ("the damage upon which a deceit action rests must have been 'proximately caused' by the misrepresentation").) It has also been noted by our appellate court that proximate cause must be shown in actions for intentional misrepresentations, even where fiduciaries are involved. See *Key v. Jewel Cos.* (1988), 176 Ill. App. 3d 91, 98 (suit alleging intentional breaches of fiduciary duty and violation of the Consumer Fraud Act); *Vermeil v. Jefferson Trust & Savings Bank* (1988), 176 Ill. App. 3d 556, 563; *Martin v. Allstate Insurance Co.* (1981), 92 Ill. App. 3d 829, 835 (suit against insurance agent for breaching his duty to plaintiff and fraud).

We conclude that plaintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved. We note, however, that Heinold adopts the term "loss causation" in its argument, a term used by Federal courts in dealing with the issue of proximate cause in

Federal security cases. Plaintiffs argue that loss causation has never been the law in Illinois.

In order to understand Heinold's use of the term loss causation, we briefly discuss Federal decisions involving Rule 10(b)—5 of the Securities and Exchange Act of 1934 and loss causation. (17 C.F.R. § 240.10b—5 (1993).) Such decisions are pertinent to our analysis because Rule 10b—5 involves misrepresentations in the sale of securities. Moreover, since a right of action under Rule 10b—5 is an implied right of action, with no statutory guidance as to damages, Federal courts have developed this area of law through reliance on common law principles of fraud and proximate cause. See *Bastian v. Petren Resources Corp.* (7th Cir. 1990), 892 F.2d 680, 683.

In order for a plaintiff to recover for a violation of Rule 10(b)—5, the great majority of Federal courts require plaintiffs to show two types of causation: (1) transaction causation; and (2) loss causation. (*Bastian*, 892 F.2d at 685.) Transaction causation has been defined as meaning that "the investor would not have engaged in the transaction had the other party made truthful statements at the time required." (*LHLC Corp v. Cluett, Peabody & Co.* (7th Cir. 1988), 842 F.2d 928, 931.) Loss causation, on the other hand, has been defined as meaning "that the investor would not have suffered a loss if the facts were what he believed them to be." (*LHLC Corp.*, 842 F.2d at 931.) In this regard, loss causation is analogous to proximate cause. It has thus been noted:

> "The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Huddleston v. Herman & MacLean* (5th Cir. 1981), 640 F.2d 534, 549.

We find Illinois law to be similar to the analysis used by these Federal courts which require both transaction causation and loss causation in order to recover for mis-

representation in securities cases. Thus, plaintiffs here must prove what the Federal courts have termed loss causation prior to any recovery of damages.

### Loss Causation: Whether Heinold's Deception Proximately Caused Plaintiffs' Losses

Plaintiffs have alleged and proven that Heinold misrepresented the nature of its foreign service fee. The trial court found that plaintiffs would not have purchased LCO's from Heinold had they had known the truth about the fee. While the trial court correctly found transaction causation, it did not find loss causation, or proximate cause, for plaintiffs to recover their full investment losses. The trial court thus erred in awarding plaintiffs their full investment losses. We find, however, that plaintiffs are entitled to recover the amount paid for the foreign service fee as damages due to Heinold's misrepresentation, as the deception proximately caused plaintiffs to pay a fee they would not have paid had they known the truth. However, Heinold's misrepresentation concerning the foreign service fee did not proximately cause plaintiffs' entire investment losses.

Prosser has noted that while a transaction may have been induced by a misrepresentation, proximate causation limits recovery to "those damages which might foreseeably be expected to follow from the *character* of the misrepresentation itself." (Emphasis added.) (W. Prosser, Torts § 110, at 732 (4th ed. 1971).) We must thus determine the character of Heinold's misrepresentation.

It is important to note that Heinold's deception did not induce plaintiffs into believing that their LCO's were more profitable than they actually were, or that they were risk free. Heinold's misrepresentations also did not concern the size of the foreign service fee. Instead, Heinold's misrepresentations concerned the *use* of the foreign service fee. As the appellate court noted, Heinold's misrepresentations had no effect on the value,

risk, or profit potential of plaintiffs' LCO's. Plaintiffs were aware of the amount of money they risked and that the market had to move enough to offset the price of the option as well as the transaction costs in order to make a profit. This was a risk plaintiffs willingly undertook at the price Heinold charged for the transactions. Plaintiffs made a market decision and either won or lost because the market did or did not move in their favor. Thus, the character of Heinold's misrepresentation had no effect on whether plaintiffs' options made or lost money. As Prosser has also noted:

"Would the decline in plaintiff's investment have occurred even if defendant's misrepresentation had been true? If the answer to this question is 'yes,' plaintiff has failed to prove that the misrepresentation proximately caused the decline." W. Prosser, Torts § 110, at 732 (4th ed. 1971).

We agree with Heinold that even if Heinold had used the foreign service fee as plaintiffs believed, plaintiffs would have suffered the same losses. Plaintiffs have not proven loss causation, or proximate cause, for investment losses.

Plaintiffs argue, however, that loss causation is against public policy because it favors the wrongdoer. Plaintiffs argue that loss causation is a call for leniency, letting wrongdoers escape their crime by simply returning the money they took from plaintiffs. We note, however, that loss causation ensures that defendants, even where an intentional tort is committed, do not become insurers of plaintiffs who make unwise investments. Without such a requirement, the law "would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission." (*Huddleston*, 640 F.2d at 549.) This policy is especially strong here where plaintiffs voluntarily undertook known market risks and lost. In this regard, loss causation respects the individual investor's market decision. Plaintiffs were content in assuming the risk of

purchasing the options, even if Heinold's deception had been true.

Plaintiffs next argue that Heinold's misrepresentations did proximately cause their loss because of the uniqueness of options. Plaintiffs argue that if Heinold's misrepresentations concerned a different type of security, such as stock, and that stock thereafter lost its value due to market fluctuation, such misrepresentations would not have caused the stock's decline in value. However, plaintiffs argue that options are different from stock in that they have a much shorter life in which to realize a profit, after which they become worthless. Plaintiffs claim that Heinold's misrepresentations prevented them from exercising otherwise profitable options because the break-even point was that much higher. Thus, plaintiffs argue, they lost their entire investment, rather than simply paying an additional fee.

We agree with plaintiffs that options are different from stock, but do not find their argument persuasive. Investing in securities necessitates undertaking risk in an attempt to make a profit. In selecting securities, the investor must determine what type of risk he is willing to take. For a minimal price, the investor who chooses to invest in options is allowed to enter the volatile futures market without the risks associated with purchasing a futures contract. If the market moves in an option holder's favor, the holder may profitably enter the futures market. If the market does not move in the holder's favor, he has the security of knowing the exact amount of money he can possibly lose, the price paid for the option plus any transaction costs. Through the use of options, the holder avoids the risk, and escapes any loss, potentially great, the market could have caused if he would have purchased a futures contract. Thus, for the security of having the right, but not the obligation,

to enter the futures market, the option holder knows that he may very well lose his entire investment. Those courageous enough to enter the commodities options market knowingly assume this risk.

The investor who chooses to purchase stock, on other hand, has entered a not-so-volatile market. What the stockholder gives up, however, is the potential to reap the great profits the option investor may make from one single leveraged transaction.

Thus, the issue is the undertaking of risk. Plaintiffs could have invested in stock, or futures, but instead chose to invest in options. They did this with the knowledge that they could possibly lose their entire investment, but with the chance that they could profit greatly on a single leveraged transaction. The misrepresentations here did not induce plaintiffs to purchase a type of security, LCO's, but only induced them to pay an additional fee. While Heinold's deception made the break-even price of the option higher, plaintiffs were willing to assume the risk of the volatile futures market at that price.

Plaintiffs next argue that Heinold's deception was intentional, and that even remote causation will be found in intentional torts. (*Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co.* (Ala. 1980), 390 So. 2d 601, 607, 609.) Plaintiffs note that intentional tortfeasors are commonly liable even for unforeseeable consequences of their conduct. See *Smith v. Moran* (1963), 43 Ill. App. 2d 373 (doctrine of transferred intent).

We believe, however, that the fact that plaintiffs willingly assumed known market risks defeats any such argument. Moreover, even intentional tortfeasors do not become the insurers of safety for wronged plaintiffs. (See *Johnson v. Greer* (5th Cir. 1973), 477 F.2d 101, 106.) The plaintiffs' willingness to assume risks in a volatile market was the more direct cause of their investment losses than Heinold's misrepresentation.

Plaintiffs further cite several decisions for the proposition that it is no defense for a fiduciary breach that losses have been due to market risks. (*Merchants National Bank v. Frazier* (1946), 329 Ill. App. 191; *In re Estate of Busby* (1937), 288 Ill. App. 500.) These decisions, however, are inapposite, as they involve trustees who breached their fiduciary duties. These cases deal with the law of trusts, which is not applicable here.

Plaintiffs also rely on language from one of this court's decisions:

"The limitation on a plaintiff's recovery proposed by defendants would mean that a fiduciary could violate his duty without incurring any risk. For if his misconduct were discovered the most he could lose would be the profit gained from his illegal venture; the law would have operated only to restore him ***." (*Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 305-06.)

While this language seems to support plaintiffs' argument, the facts involved in *Stoner* reveal otherwise. *Stoner* involved an employee of plaintiff who violated his contract and principles of agency by helping fund and launch a company to compete against his employer. Defendant helped this new company develop a better machine, which damaged plaintiff's business. The issue was damages. Plaintiff argued for its lost profits while defendants argued for the money their machine made. This court found the appropriate amount of damages to be plaintiff's lost profits because plaintiff had proven that defendant's actions actually, or proximately, caused those losses. In the instant case, Heinold's misrepresentation did not proximately cause plaintiffs' losses. We further note that there does exist a way in which to punish Heinold so that the law does not operate merely to restore it to its previous position. Punitive damages may be assessed to punish Heinold, which we discuss later.

Plaintiffs further argue that the United States

Supreme Court has held that damage measures in Federal securities fraud cases may do more than simply make the plaintiff whole for the economic loss proximately caused by the defendant's fraud. (*Randall v. Loftsgaarden* (1986), 478 U.S. 647, 92 L. Ed. 2d 525, 106 S. Ct. 3143.) We note, however, that this decision did not mean that proximate causation need not be required under every set of facts. Moreover, the *Loftsgaarden* decision addressed the issue of whether section 28 of the Securities Act of 1934 limited "rescissory recovery to the plaintiff's net economic harm." (*Loftsgaarden*, 478 U.S. at 662, 92 L. Ed. 2d at 541, 106 S. Ct. at 3152.) The Court found that section 28(a) of the Securities Act did not impose "a rigid requirement that every recovery on an express or implied right of action under the 1934 Act must be limited to the net economic harm suffered by the plaintiff." (*Loftsgaarden*, 478 U.S. at 663, 92 L. Ed. 2d at 541, 106 S. Ct. at 3153.) The Court thus allowed the rescission of a contract from which plaintiffs had already received tax benefits, even though defendants argued that plaintiffs should have to reimburse defendants the value of the tax benefits.

It should further be noted that while the United States Supreme Court found that allowing plaintiffs to recover more than their net economic harm serves a deterrent effect, punitive damages, which may serve that same effect in Illinois, are not permissible under the Federal securities act. (See *Straub v. Vaisman & Co.* (3d Cir. 1976), 540 F.2d 591, 599; *Carras v. Burns* (4th Cir. 1975), 516 F.2d 251, 259; *Green v. Wolf Corp.* (1968), 406 F.2d 291, 302.) We find the imposition of punitive damages, where justified, to more properly serve as a deterrent than in awarding plaintiffs full investment losses where those losses were not proximately caused by defendant's misrepresentations.

Plaintiffs next argue that loss causation need not be

proven in cases involving broker and fiduciary fraud. Plaintiffs rely on Federal decisions involving brokers which allow a recovery of damages without proof of loss causation. (See *Chasins v. Smith, Barney & Co.* (2d Cir. 1970), 438 F.2d 1167; *Clark v. John Lamula Investors, Inc.* (2d Cir. 1978), 583 F.2d 594.) Those courts are of a minority view, however, and this is not the law in Illinois. Most Federal courts, it should be noted, do require general loss causation and do not recognize the existence between the parties as an exception to the rule in 10b—5 actions. See, *e.g.*, *In re Catenella* (1984), 583 F. Supp. 1388, 1417.

We further note that the cases on which plaintiffs rely do not support their argument. These decisions involve brokers who fraudulently induced investors to purchase securities by misrepresenting their intrinsic value, such as their profit potential or risk (*Barthe v. Rizzo* (S.D.N.Y. 1974), 384 F. Supp. 1063), or who engaged in churing or unauthorized trading (*Board of Trustees of the Fire Fighters' Pension Fund v. Chicago Corp.* (N.D. Ill. 1989), 708 F. Supp 1499; *Hatrock v. Edward D. Jones & Co.* (9th Cir. 1984), 750 F.2d 767). Courts have noted in these cases that if a fiduciary relationship or privity does not exist between buyer and seller, loss causation must be shown. If, however, either relationship exists, the court must determine what type of fraud occurred. If the misrepresentation consisted of a fraudulent inducement to purchase the security, then loss causation need not be proven. If, however, the evil is only the price paid for the security, then loss causation must be shown. (See *In re Letterman Brothers Energy Securities Litigation* (5th Cir. 1986), 799 F.2d 967, 972.) As one of these courts has noted:

> "A plaintiff 'should not have to prove loss causation where the evil is not the price the investor paid for the security, but the broker's fraudulent inducement of the investor to purchase of the security.' [Citation.] However, loss

causation is relevant when a plaintiff complains that a defendant's misrepresentations inflated the price paid for the security. [Citation.] In that case a defendant would not be liable if the decline in value was caused by an event occurring subsequent to any misrepresentation." *Kafton v. Baptist Park Nursing Center, Inc.* (D.C. Ariz. 1985), 617 F. Supp. 349, 350.

The harm here was not the inducement to purchase the LCO, but the inducement to pay an additional fee, the fraudulent foreign service fee. The evil was the price paid. Thus, even under the analysis used in the decisions on which plaintiffs rely, they would not recover their full investment losses.

Plaintiffs next argue that damages for investment losses due to broker fraud are available under the Consumer Fraud Act without a showing of loss causation. Plaintiffs correctly note that the Consumer Fraud Act was intended to afford a broader range of protection than the common law. (See *Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300.) Plaintiffs then argue that remedies under the Consumer Fraud Act should thus be broader and that proximate cause need not be shown.

However, while the intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations, there is no suggestion in the Act that damages are to be determined in any manner different than is customary in our State. While plaintiffs note that section 10a(a) of the Act states that the trial court "in its discretion may award actual damages or any other relief which the court deems proper" (815 ILCS 505/10a(a) (West 1992)), we cannot agree with plaintiffs that this section allows the court free rein to award any amount of damages it chooses. The damages must be "proper." As our appellate court has noted, "[a] plaintiff can recover damages under the Consumer Fraud Act *only* when his injury is a direct and proximate

result of an alleged violation of the Act." (Emphasis in original.) (*Stehl v. Brown's Sporting Goods, Inc.* (1992), 236 Ill. App. 3d 976, 981, citing *Petrauskas v. Wexenthaller Realty Management, Inc.* (1989), 186 Ill. App. 3d 820, 832; see also *Fitzpatrick v. ACF Properties Group, Inc.* (1992), 231 Ill. App. 3d 690, 711-12.) We further note that an award of punitive damages, where appropriate, more properly serves the purpose plaintiffs wish absolute liability to serve in this case.

Plaintiffs finally cite *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, for the proposition that under the Consumer Fraud Act market fluctuation was a foreseeable intervening force:

> "In assessing proximate cause where an intervening force is alleged to be present, the only question of concern is 'whether or not this intervening force is without or within the range of reasonable anticipation and probability.' [Citation.] Each case must turn on its own facts. [Citation.]" (*Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 570.)

Plaintiffs argue that because market fluctuation was a foreseeable intervening force, Heinold's deception was the direct cause of its investment losses.

However, each case must turn on its own facts. Plaintiffs, as investors, necessarily assumed a risk, and that risk was the possibility that the market would not move in their favor. Where plaintiffs knowingly assumed the risk of the market at the price Heinold offered, this argument has no merit. Heinold's deception did not affect the known market risk.

## IV.

### Right to a Jury Trial

Heinold next argues that it had the right to a jury trial on plaintiffs' claims for violation of the Consumer Fraud Act and breach of fiduciary duties. The trial court denied Heinold's request for a jury trial, and the

appellate court affirmed that decision. We affirm those courts' decisions.

### Waiver

Before we address Heinold's contentions, we first address plaintiffs' argument that Heinold has waived the right to a jury trial on both claims. Plaintiffs argue that Heinold waived any right to a jury trial by waiting eight years to effectuate its request. Although plaintiffs acknowledge that Heinold filed a jury demand when it answered plaintiffs' complaint, plaintiffs note that this case was originally assigned to, and always remained in, the chancery division of the circuit court. Plaintiffs argue that Heinold waited eight years, until the case was on the eve of trial in October 1988, to move to transfer this action to the law division. Although plaintiffs have found no cases dealing directly with this issue, they do cite several where much shorter delays resulted in waiver of a right to seek a change in venue. *Horn v. Rincker* (1981), 84 Ill. 2d 139; *Wagner v. David* (1966), 35 Ill. 2d 494.

Plaintiffs' argument has no merit. Heinold did not waive the issue of its right to a jury trial under either claim. Section 2—1105(a) of the Code of Civil Procedure provides:

> "A plaintiff desirous of a trial by jury must file a demand therefor with the clerk at the time the action is commenced. A defendant desirous of a trial by jury must file a demand therefor not later than the filing of his or her answer. Otherwise, the party waives a jury. If an action is filed seeking equitable relief and the court thereafter determines that one or more of the parties is or are entitled to a trial by jury, the plaintiff, within 3 days from the entry of such order by the court, or the defendant, within 6 days from the entry of such order by the court, may file his or her demand for trial by jury with the clerk of the court." (735 ILCS 5/2—1105(a) (West 1992).)

Heinold filed a jury demand when it answered plaintiffs'

complaint. This is all Heinold was required to do under section 2—1105 of the Code of Civil Procedure.

Plaintiffs argue, however, that Heinold waited until the eve of trial to file a motion to transfer the case to the law division. We note, however, that the law and chancery divisions are not separate courts from which one must seek a change of venue. Section 9 of article VI of the Illinois Constitution provides: "Circuit Courts shall have original jurisdiction of *all* justiciable matters ***." (Emphasis added.) (Ill. Const. 1970, art. VI, § 9.) Moreover, the record shows that Heinold filed a motion after the remand from this court and prior to trial asking the trial court to transfer the cause to the law division. At oral argument on the motion, Heinold noted that it was simply reaffirming its jury demand which it had filed when it answered plaintiffs' complaint some eight years before. Heinold was merely asking the trial court to impanel a jury. As this court noted long ago:

> "Conferring jurisdiction in chancery is not excluding trial by jury. Courts of chancery may submit issues of fact to trial by jury, and although it is discretionary to do so in their ordinary course of practice, yet where there comes bestowal upon such a court jurisdiction in a case where there existed, before the adoption of the constitution, the right of trial by jury, it is to be presumed that there would be, in such case, allowance of jury trial,—that there would be obedience to the constitutional injunction that the right of trial by jury, as enjoyed at the time of the adoption of the constitution, should remain inviolate." (*Gage v. Ewing* (1883), 107 Ill. 11, 15.)

Heinold has not waived this issue for review.

### Consumer Fraud Act

Heinold first argues that it had the right to a jury trial under the Consumer Fraud Act. Heinold argues that "it is well settled constitutional law in Illinois that actions for legal relief, including statutory actions, are triable to juries as of right." Heinold finds Illinois' right

to a jury trial similar to that right under the seventh amendment of the Federal constitution in that both look to whether the remedy sought is legal or equitable in nature. (U.S. Const., amend. VII; see *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry* (1990), 494 U.S. 558, 565, 108 L. Ed. 2d 519, 528, 110 S. Ct. 1339, 1345.) Plaintiffs sought money damages, Heinold argues, which is the traditional form of damages in a case at law. Thus, it had the right to a jury trial. Heinold also notes that Consumer Fraud Act claims have routinely been tried to juries. Although the appellate court has found no right to a jury trial under the Consumer Fraud Act, Heinold insists that those decisions are in error.

Heinold is mistaken in its belief that all actions for legal relief are triable in Illinois to juries as of right. Heinold is further mistaken in analogizing Illinois' right to a jury trial with the right under the Federal Constitution. Section 13 of article I of the 1970 Illinois Constitution provides: "The right of trial by jury as heretofore enjoyed shall remain inviolate." (Ill. Const. 1970, art. I, § 13.) A similar provision was included in the constitutions of 1818, 1848, and 1870. As this court has noted:

> "We do not think there is any substantial difference between the provisions incorporated in the three constitutions. The right of trial by jury was the same under one constitution as under the other. The right protected by each constitution was the right of trial by jury as it existed at common law." *George v. People* (1897), 167 Ill. 447, 455.

As this court has more recently noted: "for the true meaning of the guarantee it was necessary to examine the English common law." (*Grace v. Howlett* (1972), 51 Ill. 2d 478, 509.) Thus, our constitution does not guarantee the right to a jury trial in any action nonexistent at common law, even if such action is legal in nature:

> "The constitutional provision that 'the right of trial by jury as heretofore enjoyed shall remain inviolate,' means that the right to a jury trial shall continue in all cases

where such right existed at common law at the time the constitution was adopted, *but that constitutional provision has never been held to prohibit the legislature from creating new rights unknown to the common law and provide for their determination without a jury.* [Citation.]" (Emphasis added.) (*Standidge v. Chicago Rys. Co.* (1912), 254 Ill. 524, 532.)

Moreover, " '[t]he constitutional provision *** was not intended to guarantee trial by jury in special or statutory proceedings unknown to the common law.' " *People ex rel. Keith v. Keith* (1967), 38 Ill. 2d 405, 408, quoting *People v. Niesman* (1934), 356 Ill. 322, 327.

On the other hand, the Federal Constitution provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial shall be preserved ***." (U.S. Const., amend. VII.) Unlike Illinois' constitution, the Federal Constitution has been interpreted to "extend[ ] beyond the common-law forms of action recognized at" the time the bill of rights was adopted. (*Curtis v. Loether* (1974), 415 U.S. 189, 193, 39 L. Ed. 2d 260, 265, 94 S. Ct. 1005, 1007.) In fact, the Supreme Court has stated:

" 'By *common law*, [the Framers of the amendment] meant ... not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered. ... In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights.' *Parsons v. Bedford*, 3 Pet. 433, 446-447 (1830) (emphasis in original)." *Curtis*, 415 U.S. at 193, 39 L. Ed. 2d at 265-66, 94 S. Ct. at 1008.

As can be seen, Illinois' constitutional right to a jury trial is not the same as that found in the Federal Constitution. In Illinois, the right to a jury trial does not attach to every action at law. Instead, such right only at-

taches in those actions where such right existed under the English common law at the time the constitution was adopted. Under the United States Constitution, however, any action at law, or one not of equity or admiralty jurisdiction, confers the right to a jury trial. It should be noted that Heinold does not argue that the Federal right applies here.

Heinold cites several cases for the proposition that the right to a jury trial depends upon the relief sought. (See *Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23; *Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146.) These decisions are inapposite, however, as they involve actions for declaratory judgment. The right to a jury trial depends on the relief sought in an action for declaratory judgment, but this is due to the nature of the declaratory judgment. While statutory, and unknown to common law, a declaratory judgment "is strictly remedial and *does not create new rights or duties*, but affords a new, additional and cumulative procedure." (Emphasis added.) (*Berk v. County of Will* (1966), 34 Ill. 2d 588, 591.) Thus, an action for declaratory judgment merely provides a procedure to bring existing actions which either confer or do not confer the right to a jury trial. As the statute provides: "If a proceeding under this Section involves the determination of issues of fact triable by a jury, they shall be tried and determined in the same manner as issues of fact are tried and determined in other civil actions." 735 ILCS 5/2—701(d) (West 1992).

Heinold also relies on *Flaherty v. Murphy* (1920), 291 Ill. 595, where this court stated:

"[T]he test whether or not the right to trial by jury exists in a given case depends on the nature of the controversy rather than the form of the action[;] there was no right of trial by jury on such issue as is raised by section 10, or on one analogous thereto, provided for under the laws of this State prior to the adoption of the constitution of 1870." (*Flaherty*, 291 Ill. at 598.)

Heinold argues that the nature of the controversy under the Consumer Fraud Act is money damages, a legal issue, and the Consumer Fraud Act is analogous to the common law action of fraud. However, we find an action under the Consumer Fraud Act to be a new statutory right created by the legislature and, as such, does not confer the right to a jury trial.

This issue was first discussed in *Richard/ Allen/ Winter, Ltd. v. Waldorf* (1987), 156 Ill. App. 3d 717. There, the appellate court found no right to a jury trial under the Consumer Fraud Act. All subsequent appellate decisions addressing this issue have agreed. See, *e.g., Rubin v. Marshall Field & Co.* (1992), 232 Ill. App. 3d 522; *Wheeler v. Sunbelt Tool Co.* (1989), 181 Ill. App. 3d 1088.

We find, as did the court in *Waldorf*, that the Consumer Fraud Act "created a new cause of action different from the traditional common law tort of fraud." (*Waldorf*, 156 Ill. App. 3d at 721.) As this court noted in *Siegel v. Levy Organization Development Co.* (1992), 153 Ill. 2d 534, 542-43:

> "[I]n order to establish a claim for common law fraud in Illinois, a plaintiff must allege and prove: (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury." (*Siegel*, 153 Ill. 2d at 542-43.)

However, to recover under the Consumer Fraud Act, a plaintiff need only show:

> "(1) a deceptive act or practice, (2) intent on the defendant's part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce." (*Siegel*, 153 Ill. 2d at 542.)

Of note, the Consumer Fraud Act does not require actual reliance, an untrue statement regarding a material fact, or knowledge or belief by the party making the statement that the statement was untrue. As one appellate decision has noted of the Consumer Fraud Act:

"[T]he intention of the seller—his good or bad faith—is not important. Rather, we focus our attention upon the effect that that conduct might have on the consumer ***." *American Buyers Club of Mt. Vernon, Illinois, Inc. v. Honecker* (1977), 46 Ill. App. 3d 252, 259.

We thus find that the Consumer Fraud Act is a statutory proceeding unknown to the common law. Because of this, our constitution does not confer the right to a jury trial for a claim under the Consumer Fraud Act.

We further note that the Consumer Fraud Act does not provide for jury trials. In fact, the wording of the statute, and its legislative history, indicate that the legislature intended the action to be tried without a jury. See *Waldorf*, 156 Ill. App. 3d at 722-25.

Heinold argues, however, that many Consumer Fraud Act claims have been tried before juries. (See *Warren v. LeMay* (1986), 142 Ill. App. 3d 550; *Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313; *Gent v. Collinsville Volkswagen, Inc.* (1983), 116 Ill. App. 3d 496.) While this may be true, the issue of whether a right to a jury trial existed was never addressed in those cases. These cases were also all decided prior to the *Waldorf* decision. Heinold further argues that if this court finds no right to a jury trial in actions under the Consumer Fraud Act, we open the door to making such findings in other instances, such as the Structural Work Act. However, that issue is not now before the court.

We conclude by noting that the drafters of our constitution were aware that the legislature could create a new statutory right that is not subject to the right of trial by jury. In fact, it was noted at the 1970 Constitu-

tional Convention that "a right to recover [in a personal injury action] without regard to fault might be regarded by the courts as a new cause of action, distinctively different from the common law right to recover for negligence." (3 Record of Proceedings, Sixth Illinois Constitutional Convention 1430.) The drafters chose not to change this area of the constitution.

### Breach of Fiduciary Duty Claim

Heinold also argues that the trial court erred in denying it a jury trial on plaintiffs' breach of fiduciary duty claims. On appeal, Heinold attacks the appellate court's finding on this matter:

"While the Illinois Constitution provides that the right to a jury trial shall remain inviolate, this right is not absolute and there is no right to a jury trial in equity actions. [Citations.] It is well established that a breach of fiduciary duty claim is an equitable action. [Citation.] Moreover, this court has consistently held that no right to a jury trial exists where an equitable accounting is sought in a breach of fiduciary duty action. [Citations.] Defendant argues, however, that the breach of fiduciary duty claim here lost its equitable nature when the parties stipulated to the numerical calculations involved in the accounting. We find that a breach of fiduciary duty claim remains an equitable action triable without a jury irrespective of how damages are calculated." 240 Ill. App. 3d at 540.

Heinold again argues that whether the right to a jury trial exists depends upon the nature of the controversy rather than on the form of the action. (*Turnes v. Brenckle* (1911), 249 Ill. 394, 403-04.) According to Heinold, plaintiffs sought only money damages, which constituted legal relief. Thus, according to Heinold, it had the right to a jury trial on plaintiffs' breach of fiduciary duty claims.

Without addressing the appellate court's finding that all actions for breach of fiduciary duties are equitable, we note that plaintiffs' claims for a breach of fiduciary

duty sought the imposition of a constructive trust and an accounting. Under these circumstances, plaintiffs' claims were clearly equitable.

## Constructive Trust

Heinold's argument concerning money damages and the imposition of a constructive trust warrants little discussion. There is no doubt that a breach of fiduciary duty claim seeking the imposition of a constructive trust on funds on account is an equitable claim, triable without the right to a jury. "A constructive trust is solely the creature of a court of chancery and is established upon purely equitable grounds." (*Miller v. Miller* (1915), 266 Ill. 522, 531.) A constructive trust "is imposed by a court of equity to prevent a person from holding for his own benefit an advantage which he has gained by reason of a fiduciary relationship or by fraud." (*Anderson v. Lybeck* (1958), 15 Ill. 2d 227, 232.) While plaintiffs sought the return of money, the remedy was not money damages, but restitution in the form of Heinold's unjust enrichment. Plaintiffs sought to impose a constructive trust on a specific fund, plaintiffs' accounts with Heinold. While Heinold believes any suit in which money is recovered constitutes an action at law, triable to a jury as a matter of right, this has never been the law in Illinois.

## Accounting

We next note that an action for an accounting for breach of fiduciary duty is also an equitable action, with no right to a jury trial. This court has previously noted that "jurisdiction in equity exists *** where a fiduciary relation exists and a duty rests upon the respondent to render an account." (*Miller v. Russell* (1906), 224 Ill. 68, 72.) It has been further held that " '[c]ourts of equity have jurisdiction to compel an accounting, although the complainant has an adequate remedy at law, where fi-

duciary relations exist ***. [Citations.]' " (*Mayr v. Nelson Chesman & Co.* (1915), 195 Ill. App. 587, 602.) This is due to the fact that "[e]quity [has traditionally] recognized and enforced fiduciary duties, so it naturally [gives] an accounting remedy against fiduciaries." 1 D. Dobbs, Law of Remedies § 2.6(3), at 158 (2d ed. 1993); see also Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L.J. 463 (1985).

Heinold argues, however, that the fact that it stipulated to the amount of money at issue makes this an action for money damages, and thus an action at law. Without addressing this argument, we note that not only were plaintiffs entitled to an accounting as to how much money Heinold was unjustly enriched by their deception, plaintiffs were also entitled to an accounting to determine what Heinold actually did with the foreign service fee.

We do note that plaintiffs asked for their full investment losses under the accounting action, which is the measure of legal damages. However, in their complaint, at the trial court, and on appeal, plaintiffs have argued for an accounting based on the breach of fiduciary duties. Plaintiffs' failure to request the proper amount of recovery for an accounting in their complaint does not affect their right to pursue an equitable accounting. Section 2—603(c) of the Civil Practice Law provides that pleadings are to be liberally construed. 735 ILCS 5/2—603 (West 1992).

## PLAINTIFFS' CROSS-RELIEF

### I.

#### Punitive Damages

Plaintiffs argue that the appellate court erred in reversing the trial court's award of punitive damages. We agree and reinstate the trial court's award of punitive damages.

The trial court awarded punitive damages under both counts in the amount of $500,000. In doing so, the court stated:

"Mindful of the bad faith and intentionally misleading and deceptive nature of Heinold's conduct in this matter, and mindful of the need to deter others conducting business in Illinois affecting a vital aspect of our nation's commerce, the Court concludes that an award of $500,000 in exemplary and punitive damages shall be assessed against Defendant, such amount to be divided among class members on a *pro rata* basis in proportion to the amount that any individual class member's losses bear to the total losses awarded the class."

The appellate court reversed the award of punitive damages and stated:

"Punitive damages are clearly disfavored at law and will be awarded only for conduct that is outrageous either because the acts are done with malice, an evil motive or because they are performed with a reckless indifference toward the rights of others. [Citations.] While the record supports the trial court's finding that defendant's conduct was intentionally misleading and deceptive, we cannot say that it rises to the level of malice or reckless indifference towards the rights of others so as to justify an award of punitive damages." 240 Ill. App. 3d at 545-46.

Plaintiffs argue that the appellate court erred because the decision to award punitive damages is within the discretion of the trial court and such decision will not be disturbed on appeal unless it is against the manifest weight of the evidence. (See *Black v. Iovino* (1991), 219 Ill. App. 3d 378.) Heinold replies that the correct standard of review is whether the evidence supports the award of punitive damages (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404), which is a question of law. See *Parsons v. Winter* (1986), 142 Ill. App. 3d 354.

In *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, this court stated:

"It has long been established in this State that puni-

tive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. [Citation.] Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. [Citation.] And, while the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law. [Citation.]" (*Kelsay*, 74 Ill. 2d at 186.)

This court has also noted:

"Punitive damages are *permissible* where a duty based on a relationship of trust is violated, the fraud is gross, or malice or willfulness are shown; such an award is not automatic." (Emphasis in original.) *In re Marriage of Pagano* (1992), 154 Ill. 2d 174, 190.

Plaintiffs' suit alleged intentional breaches of fiduciary duty and willful violations of the Consumer Fraud Act. The trial court found Heinold breached its fiduciary duties to plaintiffs and that its conduct was intentional and deceptive. The appellate court agreed. As in *Pagano*, punitive damages are permissible where a duty based on a relationship of trust is violated and where the violation has been willful. We find that the facts of this case justify a claim for punitive damages.

We next find the trial court's award of punitive damages was not against the manifest weight of the evidence. Heinold intentionally misled the plaintiff class, a group to which it owed a fiduciary duty, in order to obtain higher commissions. The trial court found that Heinold acted "with malice," that Heinold "cheated, defrauded and deceived the class," and that Heinold's breaches were "intentional and in bad faith." The trial court noted that its findings were based on the evidence presented in addition to the demeanor of the witnesses at trial. The purpose of punitive damages is to punish

the wrongdoer. A fiduciary such as Heinold would have little reason not to conduct its business in a fraudulent manner if the most it would be required to pay to plaintiffs would be Heinold's gains, as is the case here.

Heinold argues, however, that "[t]here is no evidence in this case to support a finding of 'conduct involving some element of outrage similar to that usually found in crime,' which is the legal standard that must be met to support a punitive damages award," citing *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404. Heinold also notes the great lengths to which it went in order to ensure that the summary disclosure statement was complete and that the statement complied with the applicable Commission regulations. As noted previously, however, we do not agree that Heinold's deception complied with Commission regulations. Heinold's intentional deception, which the trial court found was done with malice, did involve an element of outrage similar to that usually found in crime.

## II.

### Prejudgment Interest

Plaintiffs next argue that the appellate court erred in reversing the trial court's award of compounded prejudgment interest under the Consumer Fraud Act. However, because the trial court also awarded prejudgment interest on the breach of fiduciary duty count, which award has not been appealed, we need not discuss this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded to the

circuit court for entry of judgment in accordance with this opinion.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

I disagree with that part of today's decision which holds no right to a jury trial exists under this State's constitution for Consumer Fraud Act claims for legal damages. (163 Ill. 2d at 71-77.) The holding owes much to a perceived difference between article I, section 13, of our constitution and the seventh amendment of the Federal Constitution. (163 Ill. 2d at 71-74.) The holding is also grounded on the view that Consumer Fraud Act claims are singular in nature. 163 Ill. 2d at 74-77.

The majority is wrong in both respects. The expression of the right to a jury trial in this State's constitution is the same as that of the seventh amendment. No basis exists to construe the clauses' respective scopes differently. Thus, the conclusion that the seventh amendment right operates in statutory actions applies for article I, section 13, as well. The concern for any particular statutory claim is whether the right remedied resembles one for which the common law also afforded recovery.

The jury trial right operates for a Consumer Fraud Act claim because similar recovery was recognized at common law. The Consumer Fraud Act merely expands rights previously enforceable; it does not create entirely new ones. Rights now statutorily actionable are similar to ones protected at common law under a theory of fraud.

For those reasons, as explained more fully below, I dissent.

### The Illinois Constitutional Jury Trial Right and the Seventh Amendment

This State's Constitution of 1970 guarantees that "[t]he right of trial by jury as heretofore enjoyed shall remain inviolate." (Ill. Const. 1970, art. I, § 13.) The majority notes that similar clauses found in each of this State's earlier constitutions have been construed the same in substance. (163 Ill. 2d at 72, citing *George v. People* (1897), 167 Ill. 447, 455.) True enough. But different phraseology has been used by the respective drafters over time in expressing the right. As the clauses are construed to express the same right, the different phraseology reveals much about the right's scope.

The phrase "shall remain inviolate" pertaining to preservation of a jury trial right is found in all four of this State's constitutions. However, the clauses of the 1818 and 1848 constitutions did not also contain the phrase "as heretofore enjoyed" pertaining to what exactly was preserved. (Ill. Const. 1818, art. VIII, § 6; Ill. Const. 1848, art. XIII, § 6.) What jury trial right "remain[ed] inviolate" was first defined as one "heretofore enjoyed" in the 1870 constitution. (Ill. Const. 1870, art. II, § 5; see generally G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 24-27 (1969).) Our present constitution retains the phrase "as heretofore enjoyed" as a reference point.

The phrase "as heretofore enjoyed" precludes an expansive construction of what jury trial right exists under this State's constitution. It was not intended that the constitutional expression of the right would change the scope or nature of it. That is, what "remain[s] inviolate" under article I, section 13, is a jury trial right as was enjoyed at English common law during the 18th century. See *Grace v. Howlett* (1972), 51 Ill. 2d 478, 509.

The phraseology of the jury trial right clause of the 1848 constitution provides a second reference point. That clause defined the jury trial right as one which "shall extend to all cases at law." (Ill. Const. 1848, art. XIII, § 6.) The jury trial right was thus also limited to claims for legal, or money, damages as distinguished from equitable relief.

That is significant, again, because the substance of the right expressed has been held to be "the same under one constitution as under the other." (See *George*, 167 Ill. at 455.) Our present constitution, too, must distinguish between common law legal damage claims—for which the right operates—and common law claims for equitable relief—for which it does not.

Article I, section 13, thus must operate to provide a jury trial right as existed for actions at common law for legal damages. The majority here seems to understand the point. It observes that this State's jury trial right does not operate for any claim "nonexistent" at or "unknown" to the common law even if legal damages are sought. (163 Ill. 2d at 71-73.) What the majority ignores, however, is that, by virtue of the Supreme Court's construction, the seventh amendment's scope is identical.

The seventh amendment, unlike the expressions of the jury trial right clauses of this State's constitutions, directs its operation to "suits at common law." (U.S. Const., amend. VII.) But the phrase "suits at common law" has long been interpreted to mean more than the body of English decisional law predating the amendment's adoption. The phrase is read to mean suits at common law "in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights *** were administered." (Emphasis added.) *Parsons v. Bedford* (1830), 28 U.S. (3 Pet.) 433, 446-47, 7 L. Ed. 732, 737.

Both article I, section 13, and the seventh amendment therefore preserve only such a jury trial right as existed at common law for legal damage claims. The central question is whether that includes claims for legal damages based on a statute.

That the seventh amendment's scope includes statutory claims is considered by the Supreme Court a point " 'too obvious to be doubted.' " (*Curtis v. Loether* (1974), 415 U.S. 189, 193, 39 L. Ed. 2d 260, 266, 94 S. Ct. 1005, 1008, quoting *Rogers v. Loether* (7th Cir. 1972), 467 F.2d 1110, 1114 (listing an "unbroken line of cases" in which the Court has so acknowledged the seventh amendment's operation).) But, though the majority seems to see that, like the seventh amendment, article I, section 13, preserves a jury trial right as existed at common law for legal damage claims, it finds the same conclusion does not apply here. It cites, as reasons to more narrowly construe article I, section 13, two of this court's passing observations about the jury trial right. The observations merely beg the central question.

The first observation is that this State's jury trial right was not intended to operate " ' "in special or statutory proceedings unknown to the common law." ' " (163 Ill. 2d at 73, quoting *People ex rel. Keith v. Keith* (1967), 38 Ill. 2d 405, 408, quoting *People v. Niesman* (1934), 356 Ill. 322, 327.) I agree with that. The point, however, has no meaning here. Actions "nonexistent" at or "unknown" to the common law plainly fall outside the reach of the constitutionally expressed right.

The second observation is that nothing in that constitutional expression " 'prohibit[s] the legislature from creating new rights unknown to the common law and provide for their determination without a jury.' " (163 Ill. 2d at 73; *Standidge v. Chicago Rys. Co.* (1912), 254 Ill. 524, 532.) The point is no less evident than the first. New rights—those truly nonexistent at or un-

known to the common law—are beyond the express protections of the constitutional expression. Given such a new right, a jury trial could only be guaranteed as a matter of legislative prerogative.

Ironically, the majority misses what aid the second observation provides on the issue. The quoted statement refers, quite accurately, to rights—not actions—nonexistent at or unknown to the common law. The type of action is immaterial in determining what could be said to be nonexistent at or unknown to the common law. (See *Parsons*, 28 U.S. (3 Pet.) at 445-46, 7 L. Ed. at 737 (noting that the Federal right extends to all suits "whatever may be the peculiar form which they may assume to settle legal rights").) Statutory actions, of course, did not exist at common law in any literal sense. The concern is simply whether the substantive right giving rise to legal recovery resembles one for which recovery could be had at common law. That a right formerly actionable or enforceable at common law is now the subject of codification is immaterial. See *Rogers*, 467 F.2d at 1117.

Beyond misapprehending what has been noted in the past about this State's constitutional jury trial right, the majority does not explain why article I, section 13, and the seventh amendment should not be similarly construed. The analysis regarding the seventh amendment was first expounded in *Curtis v. Loether* (1974), 415 U.S. 189, 39 L. Ed. 2d 260, 94 S. Ct. 1005, which involved an action under the Civil Rights Act of 1968. But the basic principle had actually been established in *Parsons*, 28 U.S. (3 Pet.) at 446-47, 7 L. Ed. at 737. There, Justice Story had concluded that the amendment " 'embrace[d] all suits *** not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights.' " (*Curtis*, 415 U.S. at 193, 39 L. Ed. 2d at 266, 94 S. Ct. at 1008, citing

*Parsons*, 28 U.S. (3 Pet.) at 446-47, 7 L. Ed. at 732.) The seventh amendment right therefore operated even for a statutory claim so long as the "statute create[d] legal rights and remedies[ ] enforceable in an action for damages in the ordinary courts of law." (*Curtis*, 415 U.S. at 194, 39 L. Ed. 2d at 266, 94 S. Ct. at 1008.) In that sense, the Court had remarked, the seventh amendment "extends beyond the common law forms of action." *Curtis*, 415 U.S. at 193, 39 L. Ed. 2d at 265, 94 S. Ct. at 1007.

The majority here finds, in that last quoted remark, reason to believe allusion was being made to a more expansive scope for the seventh amendment than that of article I, section 13. (See 163 Ill. 2d at 73.) That reading is inaccurate. The Court's holding makes plain that the seventh amendment "extends beyond common law forms of action" only to the extent it operates in statutory actions at all. As Justice Brennan has explained:

"The *** test *** expounded in *Curtis v. Loether* [citation] requires a court to compare the right at issue to 18th-century English forms of action to determine whether the historically analogous right was vindicated in an action at law or in equity, and to examine whether the remedy sought is legal or equitable in nature." (*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry* (1990), 494 U.S. 558, 574, 108 L. Ed. 2d 519, 534, 110 S. Ct. 1339, 1349-50 (Brennan, J., concurring in part and concurring in the judgment).)

The seventh amendment does not go beyond the common law in any other respect. Eighteenth-century English forms of action remain the basis for operation of the right—just as they do for article I, section 13. See *Howlett*, 51 Ill. 2d at 509.

Let there be no doubt, the majority's decision today limits this State's constitutional jury trial right in a way never envisioned by its drafters. By failing to apply the same analysis given the seventh amendment, the

majority precludes the operation of article I, section 13, in every statutory claim. Its misreading of case law reduces the concerns about what actions existed at or were known to the common law to a literal exercise; only actions of a type which, in fact, existed at or were known to the common law would come within reach of the scope of article I, section 13. Abandoned is any notion of the constitutional jury trial right as "an object of deep interest and solicitude" about which every encroachment has been "watched with great jealousy." (*Parsons*, 28 U.S. (3 Pet.) at 446, 7 L. Ed. at 736.) It is too obvious to me that, like the seventh amendment, statutory claims for legal damages involving rights enforceable at common law come within the protection of article I, section 13, of this State's constitution.

## The Consumer Fraud Act

Whether article I, section 13, affords a jury trial right specifically for Consumer Fraud Act claims is a matter of two considerations: the claim must seek legal, not equitable, damages; and the claim must be based on a right similar to one enforceable at common law. The second of those concerns is the more important here. That concern directs a comparison of Consumer Fraud Act claims to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. (See *Chauffeurs, Teamsters & Helpers, Local No. 391*, 494 U.S. at 565, 108 L. Ed. 2d at 528, 110 S. Ct. at 1345; see also *Flaherty v. Murphy* (1920), 291 Ill. 595, 598 (stating that the claim must be at least "analogous" to one "provided for under the laws of this State prior to the adoption of [this State's constitution]").) Again, material to the analysis is not simply the type of action, but whether it involves "rights and remedies of [a] sort typically enforced in an action at [common] law." *Curtis*, 415 U.S. at 195, 39 L. Ed. 2d at 267, 94 S. Ct. at 1009.

The majority rejects the argument here that a claim under the Consumer Fraud Act is analogous to one at common law for fraud. That conclusion is based on adaptation of the appellate court's analysis in *Richard/ Allen/ Winter, Ltd. v. Waldorf* (1987), 156 Ill. App. 3d 717. (163 Ill. 2d at 75.) The analysis in that case makes much of the Consumer Fraud Act's purpose in affording consumers protection broader than that afforded at common law. 163 Ill. 2d at 75; see *Richard/ Allen/ Winter, Ltd.*, 156 Ill. App. 3d at 721-22.

There is no question about the broad protection afforded under the Consumer Fraud Act. Not only are claims satisfying the elements of common law fraud subsumed by it, the Act relaxes those elements to reach other types of related claims. (*Siegal v. Levy Organization Development Co.* (1992), 153 Ill. 2d 534, 543.) Neither a showing of an intent to deceive nor a scheme to defraud is required under the Act. It is therefore possible to recover for innocent misrepresentations. (Ill. Rev. Stat. 1979, ch. 121$^{1}$/$_2$, par. 262; see B. McDonald, *The Applicability of the Illinois Consumer Fraud and Deceptive Business Practices Act to Private Wrongs*, 39 DePaul L. Rev. 95, 96 (1989); see also 163 Ill. 2d at 75-76.) It is not even necessary to prove actionable reliance. (Ill. Rev. Stat. 1979, ch. 121$^{1}$/$_2$, par. 262; see 163 Ill. 2d at 75-76.) Remedies, too, are extended under the Act. Ill. Rev. Stat. 1979, ch. 121$^{1}$/$_2$, par. 270a(c) (providing for the recovery of attorney fees).

In so eliminating various hurdles met in pursuing common law fraud actions, the majority is satisfied that the Consumer Fraud Act creates rights "unknown to the common law." (163 Ill. 2d at 76.) I am not. I do not believe the mere broadening of a right for which legal recovery may be had makes the right new.

Instructive on the point is the Seventh Circuit Court of Appeals' analysis in *Rogers*, adopted by the Supreme

Court in *Curtis*, 415 U.S. at 195, 39 L. Ed. 2d at 267, 94 S. Ct. at 1009. The jury trial right issue arose there, as noted earlier, pursuant to a statutory Federal civil rights action. The claim specifically alleged racial discrimination against a landlord for refusing to let an apartment. The nature of the right protected, the court concluded, was analogous to ones protected at common law. *Rogers*, 467 F.2d at 1117.

Those actions, however, were hardly identical to the breadth of protections afforded under section 812 of the Civil Rights Act of 1968, the section allegedly violated. The actions cited included ones against innkeepers for refusing room to travellers without justification and a species of defamation available against landlords who refused to let rooms citing a tenant's unfitness when race was the reason. (*Rogers*, 467 F.2d at 1117.) The comparison to common law actions was stretched even further. The court noted common law claims for intentional infliction of emotional distress reflected possible aspects of a Civil Rights Act claim. (*Rogers*, 467 F.2d at 1117.) The point is simple: statutory claims for legal damages do not have to be identical to common law actions for the jury trial right to attach, they need only be similar.

Given its view of our Consumer Fraud Act, the majority, I am certain, would view the Federal Civil Rights Act of 1968 to provide new rights and remedies beyond those which existed at or were known to the common law. That act expanded, in no small way, the manner and type of actionable discrimination. Citing the court of appeals analysis, the Supreme Court determined statutory claims pursuant to the Federal Civil Rights Act were analogous to common law actions. (*Curtis*, 415 U.S. at 193, 39 L. Ed. 2d at 266, 94 S. Ct. at 1008.) Unfortunately, the majority fails to appreciate the import of that analysis.

The same logic applied by the Supreme Court applies here to show that the Consumer Fraud Act is analogous to actions based on fraud at common law. The requisite elements of a Consumer Fraud Act claim are irrelevant. A claim under the Act is analogous to one at common law simply if the underlying right protected, not what is necessary to its enforcement, is new.

The Consumer Fraud Act does not create fundamentally new rights not previously enforceable. Instead, it continues to protect consumers' interests in the marketplace. Those same interests found similar protection at common law under a theory of fraud. The Act may more comprehensively protect those interests by expanding, similar to the Civil Rights Act, the manner and type of actionable conduct. But the underlying interests protected by the Consumer Fraud Act are not dissimilar to those long protected at common law. Those rights, now statutorily enforceable, are no less analogous to common law fraud actions than are Federal Civil Rights Act claims to the common law actions noted above.

The majority also notes that the Consumer Fraud Act nowhere provides for jury trials. (163 Ill. 2d at 76.) It again is persuaded by the appellate court's reasoning in *Richard/ Allen/ Winter, Ltd.* The appellate court there noted that the Consumer Fraud Act provides only that a "court" may provide damages "in its discretion." (*Richard/ Allen/ Winter, Ltd.*, 156 Ill. App. 3d at 724-25.) Noting "court" to be synonymous with "judge" or "judges," it was determined that the General Assembly envisioned no participation by a "jury" in a Consumer Fraud Act claim. *Richard/ Allen/ Winter, Ltd.*, 156 Ill. App. 3d at 724-25.

Even if that conclusion is correct, and I have serious doubt as to it, the point is of no consequence. The jury trial right at issue here is a matter of constitutional grace. The legislature has no legitimate authority to

encroach upon it. Given that Consumer Fraud Act claims for legal damages create no new rights, the General Assembly could not, even if it so intended, preclude the operation of article I, section 13.

JUSTICE McMORROW joins in this partial concurrence and partial dissent.