In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3440

Estelle Bober, Executor of the Estate
of Mortimer Bober, on behalf of Mortimer
Bober and all others similarly situated,

Plaintiff-Appellant,

v.

Glaxo Wellcome PLC, Warner Lambert
Corporation, and Warner Wellcome
Consumer Healthcare Incorporated,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3243--James B. Zagel, Judge.

Argued December 1, 2000--Decided April 5, 2001

Before Posner, Diane P. Wood, and Williams, Circuit
Judges.

Williams, Circuit Judge.  Mortimer Bober brought
a class action lawsuit against the firms that
manufacture and market Zantac 75 and Zantac 150,
the over-the-counter and prescription strength
forms of the stomach acid reliever ranitidine, on
the ground that the firms provide consumers with
false and misleading information about the
substitutability of the two drugs, in violation
of Illinois law. The district court dismissed
Bober's claims under Fed. R. Civ. P. 12(b)(6)
after concluding that Illinois law exempted the
statements at issue from being a possible basis
of liability. We affirm.

I

Zantac 150 is manufactured and sold by British
drug company Glaxo Wellcome PLC and its American
subsidiary Glaxo Wellcome, Inc. The Food and Drug
Administration ("FDA") has approved it for use in
the treatment of various digestive tract
conditions, including certain kinds of ulcers and
certain esophageal conditions. As its name
suggests, it contains 150 milligrams of
ranitidine. And, it is available only with a

prescription.

Zantac 75 is manufactured by Glaxo Wellcome, Inc. and is sold by Warner-Lambert Consumer Healthcare, a joint venture formed by Glaxo Wellcome, Inc. and Warner-Lambert Company, another American drug company. According to its FDA-approved packaging, it is to be used for the relief and prevention of heartburn associated with acid indigestion and sour stomach. As its name too suggests, it contains 75 milligrams of ranitidine. But, it may be purchased without a prescription.

Bober's complaint alleges that Glaxo Wellcome PLC and the other three defendants ("Glaxo") provide false and misleading information regarding whether Zantac 75 can be substituted for Zantac 150. The answer to that question was important to Bober because, at the time he filed this lawsuit, he was paying $1.47 per tablet for the Zantac 150 his doctor had prescribed for him, while an equivalent dose of Zantac 75 (two tablets) cost $.80. In an effort to obtain information on the substitutability of Zantac 75 and Zantac 150, Bober twice called a consumer hotline for Zantac 75 users set up by Warner-Lambert. When Bober first called the Zantac 75 consumer hotline, the hotline operator "told Mr. Bober that Zantac 75 and Zantac 150 were not the same medications, and that Mr. Bober could not substitute two Zantac 75 tablets for one Zantac 150 tablet." When Bober called the hotline a second time, a recorded message advised Bober, "If your doctor has directed you to take prescription Zantac, you should not substitute Zantac 75 for your prescription."

Bober's complaint also notes that Warner Lambert maintains a web site providing information about Zantac 75, although the complaint does not say whether Bober ever visited the web site. At the time Bober filed his complaint, a page on that web site answering frequently asked questions about Zantac 75 responded to a question about whether Zantac 75 could be substituted for Zantac 150 by informing visitors, "If your physician has prescribed a medicine, you should not substitute any other medicine for your prescription. You should always ask your physician any questions you may have about changing your medication."

In his complaint, Bober claims that the three quoted statements are false and misleading because, contrary to what the three statements imply, Zantac 75 and Zantac 150 contain the same medicine (ranitidine) and are therefore readily substitutable. On that basis, Bober's complaint alleges that the three statements violate the Illinois Consumer Fraud and Deceptive Business

Practices Act ("CFA") and the similar laws of other states./1 Bober's complaint also alleges that the defendants illegally conspired to violate the CFA and that the defendants were unjustly enriched by their illegal practices. The district court dismissed Bober's claims under Fed. R. Civ. P. 12(b)(6), reasoning that the CFA exempted the three statements at issue from being possible bases of liability under the CFA because the statements were authorized by state and federal law. As the statements at issue did not violate the CFA, the district court further concluded that the statements would not support Bober's common law claims. Bober's estate, taking up Bober's claims in the wake of his recent passing, appeals. As with all Rule 12(b)(6) dismissals, we review the district court's decision de novo, taking the plaintiff's allegations as true and drawing all reasonable inferences in his favor. Jacobs v. City of Chicago, 215 F.3d 758, 764-65 (7th Cir. 2000).

II
A

In relevant part, the CFA provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. 505/2. To establish a violation of the CFA's prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving a trade or commerce. Zekman v. Direct Am. Marketers, Inc., 695 N.E. 2d 853, 860 (Ill. 1998); Siegel v. Levy Org. Dev. Co., 607 N.E.2d 194, 198 (Ill. 1992). Only the first of these requirements is at issue here.

In particular, Glaxo argues that the statements Bober's complaint identifies as the deceptive acts or practices supporting his CFA claim are,

as a matter of law, not deceptive. Under the CFA, a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive. People ex rel. Hartigan v. Knecht Servs., Inc., 575 N.E.2d 1378, 1387 (Ill. App. Ct. 1991); see also Graphic Sales, Inc. v. Sperry Univac Div., Sperry Corp., 824 F.2d 576, 580 (7th Cir. 1987). Thus, in determining whether the allegations in Bober's complaint state a claim for relief that satisfies the requirements of Rule 12(b)(6), we ask whether the allegedly false and misleading statements on which Bober based his CFA claim can be read to create a likelihood of deception or to have the capacity to deceive.

Bober's estate contends that the three statements at issue are deceptive in essentially three ways. First, Bober's estate asserts that the statements falsely claim that Zantac 75 and Zantac 150 do not contain the same medicine. None of the statements, however, expressly makes such a claim. The statements do claim that the two drugs are different medications, but that claim is completely true. The drugs are approved for very different maladies, went through different approval processes, and are sold in different ways. Moreover, to the extent that anyone could imply from the statements at issue that the drugs contain different medicine, information available to Zantac users, and in Bober's possession, would dispel any such implication. Cf. Tudor v. Jewel Food Stores, Inc., 681 N.E.2d 6, 8 (Ill. App. Ct. 1997) (dismissing a CFA claim on the ground that the allegedly deceptive act was not deceptive in light of all the information available to the plaintiff); Saunders v. Michigan Ave. Nat'l Bank, 662 N.E. 2d 602, 607-08 (Ill. App. Ct. 1996) (same). The web page that answers frequently asked questions about Zantac 75 (a printout of which is attached to Bober's complaint) expressly states that Zantac 75 and Zantac 150 contain the same medicine. Likewise, the packaging information for Zantac 75 (which is also attached to Bober's complaint) strongly suggests the same fact when it explains that the active ingredient in Zantac 75 is ranitidine and promotes Zantac 75's safety by noting that prescription strength Zantac has an excellent safety record. Put simply, none of the three statements at issue can reasonably be read as falsely claiming or implying that Zantac 75 and Zantac 150 do not contain the same medicine.

Second, Bober's estate asserts that, in describing Zantac 75 and Zantac 150 as different medications and discouraging substitution of the former for the latter, the three statements at issue misrepresent the therapeutic equivalence of equal doses of the two drugs (an equivalence we assume exists in reviewing the sufficiency of

Bober's complaint) by implying that Zantac 150 is more effective than Zantac 75 in treating the conditions for which Zantac 150 is prescribed./2 While it is clear that the statements at issue go out of their way to avoid any implication that equal doses of the drugs are therapeutically equivalent,/3 we think that the statements also avoid any implication that the drugs are not therapeutically equivalent. In the context of all the information available to Bober and other Zantac users, including the three statements at issue, the packaging information for Zantac 75, and the Zantac 75 frequently asked question web page, it should have been clear to Bober and other Zantac users both that Zantac 75 and Zantac 150 contain the same active ingredient and that inquiries about substituting the former for the latter are properly directed to a user's treating physician. The available information, in our view, dispels any tendency to deceive that the statements at issue might otherwise have had. Cf. Tudor, 681 N.E.2d at 8; Saunders, 662 N.E. 2d at 607-08. Accordingly, none of the three statements at issue can reasonably be read as misrepresenting the therapeutic equivalence of equal doses of Zantac 150 and Zantac 75.

Finally, Bober's estate asserts that the statements at issue both claim and imply that Zantac 75 simply cannot be substituted for Zantac 150, despite the fact that it would be perfectly appropriate for a doctor to recommend such a substitution. Again, the problem for Bober's estate is that examining the statements at issue, together and in the context of the other information available to Zantac users, eliminates any possibility of deception with regard to substitutability. Cf. Tudor, 681 N.E.2d at 8; Saunders, 662 N.E.2d at 607-08. From such a perspective, the statements discouraging substitution can only be read to discourage users from making a substitution without consulting their physicians. So read, the statements do not falsely claim or imply that Zantac 75 cannot be substituted for Zantac 150. As a matter of law, none of the three statements on which Bober based his CFA claims is deceptive.
B

Alternatively, Glaxo argues that all three of the statements are protected by section 10b(1) of the CFA, which excludes from liability "actions . . . specifically authorized by laws administered by any regulatory body or offices acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1). It also argues that the statements were "labeling" specifically authorized by the FDA under authority of the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. 321 et seq.

    The case law interpreting the relevant portion
of the CFA's exemption provision is not entirely
clear on the question of what is meant by
"specifically authorized." Contrast Weatherman v.
Gary-Wheaton Bank of Fox Valley, N.A., 713 N.E.2d
543, 547-51 (Ill. 1999); Lanier v. Assocs. Fin.,
Inc., 499 N.E.2d 440, 447 (Ill. 1986); Jackson v.
South Holland Dodge, Inc., 726 N.E.2d 1146, 1151-
55 (Ill. App. Ct. 2000); Mario's Butcher Shop &
Food Ctr., Inc. v. Armour & Co., 574 F. Supp.
653, 655-56 (N.D. Ill. 1983), with Martin v.
Heinhold Commodities, Inc., 643 N.E.2d 734, 742-
43 (Ill. 1994); Pawlikowski v. Toyota Motor
Credit Corp., 722 N.E.2d 767, 770-75 (Ill. App.
Ct. 1999), appeal denied, 729 N.E.2d 498 (Ill.
2000); Heastie v. Cmty. Bank of Greater Peoria,
690 F. Supp. 716, 720-21 (N.D. Ill. 1988). See
also Robinson v. Toyota Motor Credit Corp., 735
N.E.2d 724, 733-34 (Ill. App. Ct. 2000), appeal
allowed, 742 N.E.2d 335 (Ill. 2000); Aurora
Firefighter's Credit Union v. Harvey, 516 N.E.2d
1028, 1032-34 (Ill. App. Ct. 1987).

    However, we think that the Illinois cases can
be reconciled. The two key decisions from the
Illinois Supreme Court are Weatherman, 713 N.E.2d
543, and Martin, 643 N.E.2d 734. In Weatherman,
the court found that a disclosure of certain real
estate closing fees presented in a summary form
complied with specific federal regulatory
requirements. In so ruling, it found that the
summary did not violate the CFA, because it was
"specifically authorized" by the federal Real
Estate Settlement Procedures Act, or RESPA. This
was enough to entitle the summary to an exemption
under section 10b(1). 713 N.E.2d at 550. The
court was aware of, and distinguished, its
earlier opinion in Martin. There it had found
that the exemption was not available for a
document that only facially or technically
complied with a disclosure requirement imposed by
the Commodities Futures Trading Commission. In
spite of this technical compliance, the document
in fact misrepresented the nature of a particular
fee. The court also pointed out that the CFTC
itself had issued an opinion holding that
language in technical compliance with the
regulations may nevertheless violate federal
regulations if it is misleading in context. 643
N.E.2d at 742-43.

    Taken together, the cases stand for the
proposition that the state CFA will not impose
higher disclosure requirements on parties than
those that are sufficient to satisfy federal
regulations. If the parties are doing something
specifically authorized by federal law, section
10b(1) will protect them from liability under the
CFA. On the other hand, the CFA exemption is not

available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate.

The question is thus whether the statements Bober complains of are sufficiently within what is authorized by federal law that Glaxo is entitled to section 10b(1) protection. On this question, we limit our examination to the operator's statement--the only one that is even potentially misleading./4 The regulations implementing the FDCA are extensive and extremely detailed. Of particular relevance to the "different medications" part of the operator's statement are the regulations defining what constitutes a "new drug." A drug may be considered new based on "[t]he newness of use of such drug in diagnosing, curing, mitigating, treating, or preventing a disease . . . even though such drug is not a new drug when used in another disease or to affect another structure or function of the body." 21 C.F.R. sec.310.3(h)(4). Before any "new drug" can be marketed, the manufacturer has to file a "new drug application" and meet the various testing, production, and labeling requirements set out in the Code. There is no dispute that Zantac 75 satisfies this definition of new drug. Even if we assume that in all other relevant respects it is identical to Zantac 150, Zantac 75 is marketed as a non-prescription treatment for acid indigestion, while Zantac 150 is a prescription drug treatment for duodenal and gastric ulcers (among other things). Indeed, Glaxo submitted a new drug application prior to marketing Zantac 75. Glaxo therefore is not just specifically authorized to call these different "drugs"; it is required to do so. The only remaining question for our purposes is the relation between the term "drug" and the term "medication." Unlike "drug," "medication" does not appear to be a term of art in the federal regulations. The regulations governing the labeling and advertising of OTC drug products, however, provide as follows:

(i)  the following terms may be used interchangeably in the labeling of OTC drug products, provided such use does not alter the labeling of OTC drug products . . .

(52)  "medication(s)" or "medicine(s)" or "drug(s)"

21 C.F.R. sec.330.1(i). This provision indicates that, with respect to labeling Zantac 75, Glaxo was specifically authorized to use the terms "drugs" and "medications" as synonyms. Given that for federal regulatory purposes Zantac 75 and

Zantac 150 were indeed different "drugs," the express terms of the regulations taken as a whole specifically authorized Glaxo to say that they were different "medications," even if the statement may have led Mr. Bober as a layperson to misunderstand what was being said. See Weatherman, 713 N.E.2d at 550 (concluding that where summary fee statement was sufficient to satisfy federal regulatory requirements, allegation that statement was misleading to customers was properly dismissed).

The second half of the operator statement is not so easily dealt with, but ultimately we believe that the Illinois courts would find that it too was specifically authorized. The situation here is not a common one. When Mr. Bober asked whether he could substitute Zantac 75 for Zantac 150, the operator said he "could not." In assessing whether this was a specifically authorized response, it is significant that the federal regulations governing drug labeling and advertising imposed competing constraints on Glaxo, such that Mr. Bober's question was particularly tricky to answer. The manufacturer of a drug may not recommend or even suggest uses for a drug that are not approved by the FDA or supported by sufficient medical evidence. 21 C.F.R. sec.330.1(d) (OTC advertising); 21 C.F.R. sec.202.1(e)(6) (prescription advertising). There is no dispute that Zantac 75 had not been tested for the use to which Mr. Bober sought to put it, which means that Glaxo was prohibited from even suggesting that substitution would be appropriate. A drug is considered to be misbranded if its labeling or advertising makes any "statements comparing the safety or effectiveness, either greater or less of the drug with other agents for the same indication" if that statement is not supported by "adequate and well-controlled studies." 21 C.F.R. sec.201.57(c)(3)(v) (prescription labeling); 21 C.F.R. sec.201.6(a) (general labeling). Glaxo concedes that it had not conducted any studies that would have allowed it to say that two Zantac 75 tablets would be less (or more) effective than one Zantac 150 tablet for treatment of Mr. Bober's illness. Glaxo's position was thus precarious. It had to answer Mr. Bober's question in a way that did not suggest he could use Zantac 75 for an "off label" purpose, while at the same time it had to avoid the unsubstantiated suggestion that Zantac 150 would be superior to Zantac 75. This was a fine line to walk, and one not considered in Martin or Weatherman; unlike in those cases, Glaxo was required by federal law to say a certain amount and simultaneously required not to say too much.

Glaxo chose to reconcile its competing

obligations by answering Bober's question with the statement "you cannot substitute" Zantac 75 for Zantac 150. This statement was technically accurate, because only Bober's doctor could approve an "off-label" use for Zantac 75 and the substitution of one drug for the other. The statement was also consistent with those federal regulations requiring Glaxo to refrain from suggesting "off-label" uses for Zantac 75. In protecting itself on that side, however, Glaxo predictably opened itself up to the claim Mr. Bober is now making, namely that the statement improperly suggested that Zantac 150 was superior to Zantac 75. While Glaxo could have added "ask your doctor" without being accused of suggesting an "off-label" use and thus perhaps struck a more perfect balance between its competing regulatory obligations, under the circumstances what it chose to say and not to say was a sufficiently careful compromise to fall within what is specifically authorized by federal law.

The pharmaceutical industry is highly regulated, both at the federal level and internationally. Technical requirements abound, and it is not only possible but likely that ordinary consumers will find some of them confusing, or possibly misleading as the term is used in statutes like Illinois's CFA. But, recognizing the primacy of federal law in this field, the Illinois statute itself protects companies from liability if their actions are authorized by federal law. (Such protection would amount to nothing if it applied only to statements that were not susceptible to misunderstanding; those statements would escape liability under the CFA in any event.) Because Glaxo's statements fall within the boundaries established by federal law, under Weatherman and Martin they are entitled to protection under section 10b(1) of the CFA./5

C

Bober's complaint does not state a claim for relief under the CFA, and the district court properly dismissed Bober's CFA claim. Because Bober's civil conspiracy claim depends on his establishing that the defendant drug companies violated the CFA, the district court also properly dismissed that claim. See Adcock v. Brakegate, Ltd., 645 N.E. 2d 888, 894 (Ill. 1994). Our conclusion is the same with respect to Bober's unjust enrichment claim, as, in the absence of any deception on the part of the defendants, the requisite violation of "fundamental principals of justice, equity, and good conscience" is not present. See Alliance Acceptance Co. v. Yale Ins. Agency, Inc., 648 N.E.2d 971, 976-77 (Ill. App. Ct. 1995) (quoting HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.,

Inc., 545 N.E.2d 672, 678-79 (Ill. 1989)).

III

For the foregoing reasons, Bober's complaint fails to state a claim for relief. Accordingly, we Affirm the judgment of the district court.

/1 Neither party has addressed whether other states actually have similar laws or whether those laws differ in any material respect from the CFA. Accordingly, we will assume, as the parties assume, that the sufficiency of Bober's allegations in this regard depends entirely on whether his complaint states a claim under the CFA.

/2 Relatedly, Bober's estate also asserts that because there is no substantiation for the proposition that Zantac 150 is more effective than Zantac 75 in treating conditions for which Zantac 150 is prescribed, the statements at issue violate the CFA by implying that that proposition is correct. As we explain below, the statements do not, in our view, carry any implication about the relative effectiveness of the two drugs. In any event, the case law Bober's estate cites in support of its claim that a lack of substantiation can be deceptive makes clear that a lack of substantiation is deceptive only when the comparative claim at issue implies that there is substantiation for the claim made. BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1088-91 (7th Cir. 1994) (interpreting the Lanham Act's ban on false advertising). Here, the statements at issue do not imply that there is substantiation for a claim about the relative effectiveness of Zantac 75 and Zantac 150.

/3 A prudent strategy, to say the least, given that the FDA prohibits drug companies from promoting off-label uses for medications they manufacture or market, 21 C.F.R. sec. 330.1(d).

/4 For the reasons discussed above, we believe that none of the statements is deceptive, but because the concurring judge disagrees with respect to the operator's statement, we also consider whether that statement is excluded from liability under section 10b(1).

/5 To the extent the defendants also argue that state and federal law exempt them from liability regardless of how the CFA's exemption provision is interpreted, we decline to address that argument.

DIANE P. WOOD, Circuit Judge, concurring. Although I agree with the majority's ultimate disposition of this case, my reasons differ in one significant respect from theirs. The majority finds that none of the three statements on which Bober based his claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (CFA), 815 ILCS 505/1 et seq., is deceptive. For the reasons I explain below, I believe this gives too cramped a reading to Illinois's CFA. In my opinion, plaintiff Estelle Bober, representing the Estate of Mortimer Bober and others similarly situated, has stated at least one claim under the CFA. I do agree, however, with the majority's alternative argument in Part II.B. of its opinion that the three statements Glaxo made fell within the boundaries permitted by the Food and Drug Administration and thus were excluded from CFA liability pursuant to section 10b(1) of the CFA, 815 ILCS 505/10b(1). I am therefore happy to concur in the result.

As the majority initially acknowledges, we are dealing with three separate statements that the plaintiffs claim were deceptive or misleading for purposes of the Illinois CFA. These statements were made at different times, and in one instance through an entirely different medium. The first statement was made by the hotline operator to whom Mr. Bober first spoke. The operator, according to the complaint (which we do not second-guess at this stage), told Mr. Bober two things: that Zantac 75 and Zantac 150 were not "the same medications," and that Mr. Bober could not substitute two Zantac 75 tablets for one Zantac 150 tablet. I refer to this as the "operator" statement. The second statement was contained in a recorded message that Mr. Bober reached when he made a second telephone call ("the recorded statement"). That one said nothing about the comparison between Zantac 75 and Zantac 150, but it advised him that if his doctor "ha[d] directed [him] to take prescription Zantac, [he] should not substitute Zantac 75 for [his] prescription." The third and last statement was found on the web site that Warner Lambert maintains ("the web site statement"). In a section of the site devoted to "frequently asked questions," Mr. Bober found the following statement: "If your physician has prescribed a medicine, you should not substitute any other

medicine for your prescription. You should always ask your physician any questions you may have about changing your medication."

Although the majority acknowledges that these were three representations made at three different times, it analyzes the Bober claim as if he either heard everything at once or as if no individual statement could be deceptive for CFA purposes if the aggregate of everything the defendants said about Zantac would ultimately have given an accurate picture. Indeed, at page 5, ante, the majority squarely states that "to the extent that anyone could imply from the statements at issue that the drugs contain different medicine, information available to Zantac users, and in Bober's possession, would dispel any such implication." In apparent support of that point, it then cites two Illinois cases for the broad proposition that the claim of deception had to be assessed in light of all available information, even information that Mr. Bober might not have seen personally. See Tudor v. Jewel Food Stores, 681 N.E.2d 6 (Ill. App. Ct. 1997); Saunders v. Michigan Ave. Nat'l Bank, 662 N.E.2d 602 (Ill. App. Ct. 1996).

But neither Tudor nor Saunders stands for such a sweeping rule. In both these cases, all of the relevant information that the court thought should be taken into account when assessing deceptiveness was given to the plaintiff at the time of the disputed transaction. Even if we can assume that consumers will assimilate all the information they are given on a given occasion, I find no Illinois case holding that a company can avoid potential liability for deceptive statements if it has buried further explanatory material on a web site or in a brochure that some consumers may never see. It is even worse if, as here, the absent information would only potentially save an otherwise misleading statement. I am quite troubled by the implication one could draw from the majority's opinion that consumers have such an unbounded duty of inquiry. Such a holding would be inconsistent with Illinois's understanding of its own law, which requires that the statute be interpreted in a way consistent with its strong consumer protection purpose. What if Mr. Bober had stopped with the first telephone call, and never heard the recorded message? What if he had no access to a computer, or was not comfortable using one, and thus never visited the web site? The only answer that I can give to these questions is that Illinois law recognizes these risks and that is why it requires each separate statement to be assessed on its own. As was the case in Saunders and Tudor, relevant context is limited to particular occasions.

Looking at each of the statements individually, I agree with the majority that the recorded statement and the web site statement were not misleading. The recorded message merely advised callers to consult with their physicians if the doctor had prescribed Zantac 150, before going ahead and using Zantac 75 as a substitute. This is precisely what counsel for the Bober group insisted at oral argument was necessary and sufficient as a matter of law, and I agree with my two colleagues that there is nothing misleading in such a statement. Even if we approach this case as one in which two Zantac 75 tablets and one Zantac 150 tablet both deliver the same amount of ranitidine in the same way (which is a contested fact at this point), it remains true that prescription strength medication and non-prescription medication differ in important respects not related to the active ingredient. As the majority points out, there are different testing and approval procedures necessary for the different dosage levels of the identical medication. Perhaps more importantly, prescription medications as a practical matter give the patient a package of product and service: the product is the 150 mg. of ranitidine, and the service is a combination of the pharmacist's monitoring of dosage quality, amounts, potential interactions with other prescription drugs known to the pharmacy, and advice, and the doctor's ability to conduct similar medical monitoring, to the extent the patient needs to report back for prescription refills from time to time. Those kinds of services from the pharmacist cost money, just as any other retail-level service does. Cf. Lester G. Tesler, Why Should Manufacturers Want Fair Trade?, 3 J. L. & Econ. 86 (1960) (explaining the relationship between retail price maintenance and the provision of retail services); Benjamin Klein & Kevin M. Murphy, Vertical Restraints as Contract Enforcement Mechanisms, 31 J. L. & Econ. 265 (1988); Thomas G. Krattenmaker & Steven C. Salop, Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price, 96 Yale L. J. 209 (1986). It is therefore not surprising that the version of the product that comes securely tied to a high level of service costs more than the "discount" version. A simple recorded message that tells the patient not to substitute until he or she finds out why the doctor made a particular choice is not misleading.

The same analysis applies to the statement on the web site. Once again, it cautions the reader to check with the physician before making any changes in medication. And once again, apart from matching what we understand plaintiffs now to be arguing, this advice reflects the accurate fact

that the physician may have had good and sufficient reasons to prefer the prescription form of the drug. (Perhaps the physician does not care; but the web site leaves open the possibility that the physician may authorize substitution of the non-prescription form. It in no way hints that this would be out of the question.)

The operator, however, gave Mr. Bober a different message. That message had two parts, both of which I find problematic. First, the operator said that Zantac 75 and Zantac 150 were not the "same medications"; second, he or she said that Mr. Bober "could not" substitute one for the other. From the layperson's point of view, which Illinois law requires us to use, see, e.g. Daley v. Datacom Sys., Corp., 585 N.E.2d 51, 66 (Ill. 1991) (affirming appeals court ruling that demand letters could have misled the parking violators who received them), both of these representations might be shown to be misleading. Even if someone who had spent a career in the pharmaceutical industry would recognize that as a matter of federal regulation the two forms of Zantac are different "medications," see the majority's discussion at page 10-11, ante, a trier of fact might well conclude that an average consumer, asking whether she could substitute the products, would be misled by the statement "they are different medications" into believing that Zantac 75 could in no circumstances be used to treat the illness for which she was taking Zantac 150. Webster's Third New International Dictionary defines the term "medication" to mean, among other things, "a medicinal substance: medicament." Webster's Third New International Dictionary of the English Language Unabridged 1402 (1993). The word "medicament" in turn is defined as "a substance (as a chemical, a medicine, or an ointment) used in therapy." Id. And finally, the first definition of the word "medicine" is "a substance or preparation used in treating disease." Id. At a pragmatic level, therefore, given that Zantac 75 and Zantac 150 have the same active ingredient and, as we must assume here, might both be used to treat the same disease, the average consumer could surely consider them to be the same medication and would be misled if told otherwise. There is a difference in form that might matter, but the person who heard only the operator's message would be misled--or so a finder of fact could conclude. Cf. Daley, 585 N.E. 2d at 66 (emphasizing that whether a statement is misleading is "a factual issue which must be decided by the trier of fact."); Gammon v. GC Services L. P., 27 F.3d 1254, 1259 (7th Cir. 1994) (Easterbrook, J., concurring) (agreeing that "the trier of fact must inquire whether a

misleading implication arises from an objectively reasonable reading of [a] communication" allegedly made in violation of a federal consumer credit protection statute); United States v. Kaadt, 171 F.2d 600, 604 (7th Cir. 1949) (treating question of whether drug label is misleading as issue for the trier of fact).

The average consumer could also be misled by the flat statement that one "could not" substitute Zantac 75 for Zantac 150. Understood literally, this is simply not true. With the doctor's authorization, substitution certainly is possible, as both the recorded message and the web site conceded. But that qualification was not given by the operator. A more trusting caller might simply give up the quest and never even think to raise the subject with her doctor.

As an initial matter, therefore, I would find that the Bober plaintiffs raised a genuine issue of fact about the deceptive nature of the operator statement and therefore stated a claim under the CFA. This statement was not a mere statement of opinion for CFA purposes, because (a trier of fact could find) it was made in such a way that the consumer could reasonably treat it as a statement of fact. See Totz v. Continental DuPage Acura, 602 N.E.2d 1374, 1383 (Ill. App. Ct. 1992); Duhl v. Nash Realty Inc., 429 N.E.2d 1267, 1277 (Ill. App. Ct. 1982).

It is important that we do not, in our zeal to respect the limits federal law places on the pharmaceutical industry, adopt an impermissibly narrow interpretation of a general state law like the CFA that protects consumers in every market from acupuncture to zippers. In my opinion, the majority has made just such a misstep, and I therefore respectfully register my disagreement with that part of its opinion.